ERIC J. HEIMANN
Acting United States Attorney
C. LEVI MARTIN (WY Bar #6-3781)
Assistant United States Attorney
P.O. Box 668
Cheyenne, Wyoming 82003
Telephone: (307) 772-2124
christopher.martin@usdoj.gov

JODANNA L. HASKINS (Pro Hac Vice *pending*)
TERRY R. MILLER (Pro Hac Vice *pending*)
United States Securities and Exchange Commission
1961 Stout Street, 17th Floor
Denver, Colorado 80294
Telephone: (303) 844-1000
haskinsjo@sec.gov
millerte@sec.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | |
| AMERISTAR, LLC, | |
| Defendant, | Civil No. <u>24-cv-00169</u> |
| and | |
| AMERISTAR MK Ltd. Liability Company, FRED W. FREITAG IV, and HIGHLINE GOLD INC. a/k/a HIGHLINE GOLD LLC a/k/a HIGHLINE GOLD CORPORATION LLC, | |
| Relief Defendants. | |

## COMPLAINT AND JURY DEMAND

Plaintiff United States Securities and Exchange Commission ("SEC"), for its Complaint against Defendant AmeriStar, LLC ("AmeriStar") and Relief Defendants AmeriStar MK Ltd. Liability Company ("AmeriStar MK"), Fred W. Freitag IV, and HighLine Gold Inc. a/k/a HighLine Gold LLC a/k/a HighLine Gold Corporation LLC ("HighLine Gold") alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      The SEC brings this emergency enforcement action to stop an ongoing fraudulent scheme being carried out by AmeriStar through one or more individuals who are unknown to the SEC. AmeriStar, acting through these hidden actors, has fraudulently raised millions of dollars and is causing AmeriStar to continue to advertise its fraudulent investments to the public.

2.      AmeriStar falsely promised investors an income stream derived from a program involving certificates of deposit ("CDs"). In materials that were publicly available until recently, AmeriStar claimed it was using investor funds to generate profits based on the combination of returns on CDs purportedly insured by the Federal Deposit Insurance Corporation ("FDIC"), and fees paid to AmeriStar by borrowers who AmeriStar purportedly helps get loans from banks by increasing the borrower's creditworthiness. AmeriStar claimed these investments would earn roughly double the rate of return on a typical CD.

3.      AmeriStar has touted its investments on at least two websites, and its Facebook and Instagram accounts continue to solicit investors.

4.      AmeriStar has raised over $3.6 million from at least 22 investors. But as of July 2024, it is no longer answering phone calls from investors or returning their emails, and as of at least August 19, 2024, has taken down one of its websites.

5.      Contrary to what it promised investors, AmeriStar did not use investor funds to purchase CDs. Rather, AmeriStar diverted investor money to bank accounts controlled by Freitag and another entity and then told Freitag what to do with the funds. Large amounts of investor funds were used to purchase precious metals—not CDs—that were ultimately sent to HighLine Gold.

6.      To provide an air of legitimacy to the scheme, and to conceal their identities, the unknown actors who operate AmeriStar stole and misused the identities of individuals who they claimed were the President and a Director of AmeriStar but, in fact, have no affiliation with the company. AmeriStar also falsely claimed that it works with well-known banks and that it is registered with the SEC.

7.      As a result of the conduct described herein, AmeriStar violated and, unless restrained and enjoined, will continue to violate Sections 5(a) and (c) and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c); 77q(a)], and Section 10(b) of the Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction of this action under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)-(e) and 78aa].

9.      The SEC brings this action under the authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d)]. The SEC seeks temporary, preliminary, and permanent injunctions against AmeriStar, enjoining it from engaging in the transactions, acts, practices, and courses of business

alleged in this Complaint and from violating, directly or indirectly, the laws and rules alleged in this Complaint; disgorgement of all ill-gotten gains from AmeriStar and Relief Defendants from the unlawful activity set forth in this Complaint together with prejudgment interest; and civil penalties against AmeriStar pursuant to Section 21(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 20(d) of the Exchange Act [15 U.S.C. § 78u(d)]. The SEC seeks any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

10.    Venue lies in this Court under Section 22(a) of the Securities Act [15 U.S.C. § 77(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa] because AmeriStar is a Wyoming limited liability company and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the District of Wyoming. For example, AmeriStar stated that its business address is in Wyoming and AmeriStar misappropriated the identity of a Wyoming resident and listed that resident as its Director, including on its Form D submitted to the SEC.

## DEFENDANT AND UNKNOWN ACTORS

11.    **AmeriStar, LLC ("AmeriStar")** is a Wyoming LLC organized on or about July 21, 2023. AmeriStar has claimed to have business addresses in Sheridan, Wyoming, Cheyenne, Wyoming, and Vernon Hills, Illinois.

12.    One or more individuals unknown to the SEC control and manage AmeriStar (the "**Unknown Actors**"), and are knowledgeable about the actions taken by AmeriStar alleged in this Complaint. These individuals are responsible for, among other things, maintaining, organizing, and funding the AmeriStar website and social media accounts, communicating with investors, and directing the use of investor funds through Freitag.

13.     Despite its best efforts, the SEC has not been able to identify the Unknown Actors. The Unknown Actors have conducted business and communicated with the SEC staff through aliases.

## RELIEF DEFENDANTS

14.     **Fred W. Freitag, IV**, is a resident of Gibsonia, Pennsylvania and is an attorney licensed in Pennsylvania. On or about October 30, 2023, Freitag entered into a retainer agreement with AmeriStar in which he agreed "to handle and pool all incoming investment funds on behalf of AmeriStar LLC in accordance with legal and ethical standards. Investor funds will be remitted at the direction of AmeriStar, for the sole purpose of investment on behalf of investors." Freitag opened and controlled several bank accounts that received AmeriStar investor funds. In connection with at least one such bank account, Freitag has used the d/b/a "Law Office of Fred Freitag."

15.     **AmeriStar MK Ltd. Liability Company a/k/a AmeriStar MK, LLC ("AmeriStar MK")**, is a Wyoming LLC organized on or about September 26, 2023. Freitag is the sole member of AmeriStar MK. Some of the bank accounts that Freitag opened and controlled that received AmeriStar investor funds were in the name of AmeriStar MK.

16.     **HighLine Gold, LLC a/k/a HighLine Gold Corporation and HighLine Gold Inc. ("HighLine Gold")** is a Wyoming LLC originally organized on or about July 13, 2021 under the name High Quality Holdings, Inc. and whose name was changed to "HighLine Gold Inc." on or about March 31, 2023. It has been administratively dissolved by the Wyoming Secretary of State. Precious metals that were purchased with AmeriStar investor funds was placed in accounts owned by HighLine.

**FACTS**

**I.  AmeriStar Offered and Sold Securities in a "Courtesy Deposit" Program.**

17.     Between August 2023 and the present, AmeriStar has solicited the general public

to invest in its securities through websites and social media, including Facebook and Instagram.

AmeriStar has offered and sold investments in the form of promissory notes.

18.     AmeriStar has stated that it can offer high yield investments by using investor

money to purchase CDs at banks as part of its "courtesy deposit" program. AmeriStar has stated

that businesses trying to borrow money from a bank would pay AmeriStar a fee for it to purchase

a CD at the bank, which AmeriStar would retain ownership of and control over. AmeriStar calls

making such a CD purchase a "courtesy deposit" and has claimed that such a "courtesy deposit"

would entice banks to loan money to the borrower.

19.     AmeriStar illustrated the purported source of profit for its investments in a

document referred to as an investor brochure ("Investor Brochure"), which was made available

on its website from at least on or about March 21, 2024, and removed at some point before May

16, 2024. The Investor Brochure provided an example to illustrate AmeriStar's profits: an

investment would first generate 5% to 7% profit from the fee paid to AmeriStar by a borrower in

exchange for the "courtesy deposit," and then generate an additional 4% to 6% profit from

interest paid on the CD by the bank:



20.     The Investor Brochure also explained that a "courtesy deposit" is: "*a Certificate of Deposit that AmeriStar makes into the FDIC bank [sic] that the borrower is attempting to get a loan from. The CD is not in the Borrowers [sic] name, the Borrower cannot use it for collateral, cannot lien or encumber it in anyway. The borrowers [sic] banker however sees that the deposit was made by 'introduction' of the borrower. It just increases the banks [sic] balance, and makes the banks more likely to make the loan to the borrower*."

21.     The "courtesy deposit" program was also described on AmeriStar's publicly available website, www.amersitarinvestment.com ("AmeriStar Website"), which was available to the public from at least August 2023 to August 2024—the SEC staff were first unable to access the AmeriStar Website on August 19, 2024.

22.     The AmeriStar Website explained the investment opportunity by stating that "*AmeriStar combines a Certificate of Deposit and a 'courtesy deposit', to generate two returns[.]*"

23.     In response to what is labeled a frequently asked question that the investment seems too good to be true, the AmeriStar Website explained, "*[W]ell you are right, no FDIC bank could ever have interest of 12% in this market. But AmeriStar is not providing a CD at*

*12%. The investment is into a [SEC] Regulation D private offering that combines a CD and a*

*'courtesy deposit'.*"

24.     AmeriStar also described the "courtesy deposit" investment opportunity in a

document titled AmeriStar Confidential Private Placement Memorandum ("PPM"), at least two

versions of which were published on the AmeriStar Website, from at least February 2024 to

August 2024.

25.     In the PPM, AmeriStar explained the purported "courtesy deposit" program under

the "Use of Proceeds" heading:

> The investment funds received through the 506(b) placement will be
> utilized to purchase Brokered and Bank FDIC Certificates of
> Deposit, following a specific investment structure. This structure
> requires is [sic] that third party Borrowers approach AmeriStar LLC
> affiliated firms who cannot obtain conventional funding directly
> from a bank. AmeriStar will make a 'courtesy deposit' into the bank
> that the Borrower is working with. The 'courtesy deposit' is the
> purchase of FDIC insured Certificate of Deposit (CD). The
> Borrower has no right to the CD, they cannot be liened, encumbered
> or loaned against in any way. The CD's [sic], will remain in
> AmeriStar's account, under AmeriStar's control. The Borrower
> however is able to show the bank, that they have just arranged a
> sizable deposit, which may make the bank more willing to provide
> funding to that Borrower. Borrowers will pay a fee to AmeriStar of
> between 4% to 7% of the total "courtesy deposit."

26.     AmeriStar's securities were also advertised on website called

bankingsecure.app/en/ ("Banking Secure Website"). The Banking Secure Website included

claims that AmeriStar was investing investor funds in FDIC-insured CDs, including: "*Why*

*Choose Us[?] 1. FDIC Insurance[.] All accounts that AmeriStar purchases Certificates of*

*Deposit in, carry FDIC insurance*."

27.     AmeriStar also uses advertisements on social media to promote its business.

28.    Since at least August 11, 2023, an AmeriStar Instagram page advertises AmeriStar's investments to the public. The AmeriStar Instagram page includes a link to the AmeriStar Website.

29.    Since at least August 15, 2023, a Facebook page advertises AmeriStar's investments to the public. The AmeriStar Facebook page includes a link to the AmeriStar Website and lists the email address info@AmeriStarinvestment.com. The AmeriStar Facebook page has advertised "High Yield Investments." For example, on February 14, 2024, the AmeriStar Facebook included this cover photo:



30.    AmeriStar offers the investments alleged in this Complaint in the form of unsecured promissory notes.

31.    In exchange for their investment funds, at least some investors receive subscription agreements and promissory notes. The notes state that the principal amount is due

within a specified number of months or at maturity of the subscription agreement and, during the

term of the note, AmeriStar will make monthly interest payments based on a specified annualized

rate of return.

**II. AmeriStar's Statements That It is Using Investor Funds to Purchase FDIC-Insured CDs are Materially False and Misleading.**

32.     On websites and social media and in other investor materials, AmeriStar,

controlled by and at the direction of one or more Unknown Actors, has claimed that it was using

investor funds to purchase FDIC-insured CDs, and further claimed that all investments were

fully insured.

33.     The AmeriStar Website claimed that each investment was insured by the FDIC:

     a.    Under "Frequently Asked Questions": "*Is my investment FDIC insured? Yes. AmeriStar only works with banks that are FDIC insured. All accounts and Certificates of Deposit are insured up to $250,000.*"

     b.    Under "CDS AT A GLANCE": "*FDIC Insured. … We provide an array of terms varying from six months up until five years at attractive interest rate [sic] which makes obtaining greater returns possible without ever comprising principal invested funds security, even during uncertain economical [sic] situations. How? Because each account is insured up the the [sic] maximum FDIC insurance of $250,000. When investments are higher than $250,000, we simply open multiple deposit accounts so no one account or investment ever goes higher than the FDIC maximum threshold.*"

34.     The PPM stated that AmeriStar would place investor funds in FDIC-insured CDs,

including, as explained above, in the description for "Use of Proceeds." The PPM also stated

under the section for "Financial Projections" that "*… the fund aims to provide stable returns of 5% from courtesy deposit Borrowers, in additional [sic] to FDIC bank insured CD returns of 4% to 6% to investors over the defined investment horizon*."

35.     The Investor Brochure stated that AmeriStar was investing investor funds in FDIC-insured CDs, including the following:

      a.     "*All investments are FDIC Insured[.] Because AmeriStar is a FinTech, all Certificate of Deposits [sic] are purchased through FDIC insured banks.*"

      b.     "*How we Stack FDIC Insurance for your Security. … AmeriStar utilizes a special strategy that allows us to open multiple accounts when the investment amount is over $250,000, so all investments are always FDIC insured.*"

      c.     "*How is it Secure? … Always FDIC insured.*"

36.     The AmeriStar Facebook page stated that AmeriStar was investing investor funds in FDIC-insured CDs, including, for example:

      a.     A March 26, 2024 post, which remained available as of August 21, 2024, provided:



b.    A February 14, 2024 cover photo (which, as of at least August 21, 2024 was changed to a different cover photo) advertised a 13-month CD and stated: "*A High Yield Investment with the security of FDIC Insurance. Come and learn what a dual investment income stream can do for your portfolio.*"

c.    A post on February 2, 2024 stated: "*Dive into the world of strategic investing with our range of high-yield Certificate of Deposits! ... all backed by FDIC insurance.*" This post appears to have been removed sometime before August 21, 2024, though as of August 21, 2024, the AmeriStar Facebook account continued to include posts that advertised investments in CDs and referred to FDIC-insurance, as shown above.

37.    The AmeriStar Instagram page previously stated that AmeriStar was investing investor funds in FDIC-insured CDs, including, for example, in posts from February 2024

regarding 61-month, 49-month, 25-month, and 13-month CDs stating: "*A High Yield Investment with the security of FDIC Insurance. Come and learn what a dual investment income stream can do for your portfolio.*" These posts appear to have been removed sometime before August 21, 2024, though the AmeriStar Instagram account continues to advertise CDs.

38.    At least some promissory notes purchased by investors investments stated that investments were secured by FDIC-insured CDs.

39.    A reasonable investor would have understood from the statements above that AmeriStar would use funds invested by investors to purchase CDs insured by the FDIC.

40.    Each of the statements above regarding AmeriStar's purported purchase of FDIC-insured certificates of deposit is false and misleading. At least as of July 29, 2024, AmeriStar did not purchase CDs from the AmeriStar bank accounts into which investors' money was deposited. Freitag, who handled and pooled AmeriStar investor funds and remitted those funds at the direction of AmeriStar, did not purchase CDs on behalf of AmeriStar.

41.    Instead, AmeriStar caused its investors' funds to be used for large payments to companies that sell precious metals, payments to Freitag and an individual with the same last name as him, and payments to other entities and individuals. The primary uses of funds are summarized below:

| Transaction Type | Amount |
|---|---|
| Investor Funds In | $3,698,536.37 |
| Funds Out to Precious Metal Dealers [net] | ($2,047,171.38) |
| Apparent Investor Refunds | ($1,029,801.37) |
| Funds Out to Other Individuals / Entities [approximate] | ($300,000) |
| Funds out to Freitag / Assumed Relative | ($99,000) |

42.     The statements regarding investor funds being FDIC-insured are also false and misleading because AmeriStar investor funds were often held in bank accounts with balances over $250,000, rendering those accounts *not* fully FDIC-insured.

43.     AmeriStar's statements concerning the intended use of investor funds were false and misleading at the times they were made because AmeriStar did not intend to purchase CDs with investor funds. AmeriStar's conduct demonstrates a knowing pattern in which it raised funds through fraudulent statements and then misused those funds.

44.     On or about March 18, 2024, the FDIC issued a letter to AmeriStar and HighLine. In the letter, the FDIC stated that certain statements by AmeriStar on its website and social media contain "apparent misrepresentations about FDIC deposit insurance," including AmeriStar's claim on its website that "'investments' in AmeriStar's 'High Yield Certificate of Deposit Program' … are 'FDIC Insured.'"

45.     Each of the statements above regarding AmeriStar's purported purchase of FDIC-insured CDs was false and misleading when made and the Unknown Actors controlling AmeriStar knew or were reckless in not knowing, and should have known, that the statements were false and misleading. The scienter and negligence of the Unknown Actors is imputed to AmeriStar.

46.     The misrepresentations concerning the use of investor funds are material to investors and potential investors. Investors reasonably understand that the profit promised by AmeriStar will be made possible by the purchase of CDs insured by the FDIC as part of AmeriStar's purported "courtesy deposit" program. It would be important to potential investors' decision to invest to know that AmeriStar would not purchase CDs and that their investments would not be insured by FDIC insurance.

47.     All the misrepresentations concerning the use of investor funds detailed above were made in connection with the offer, purchase, or sale of securities.

48.     AmeriStar made and disseminated each misrepresentation and omission detailed above using the means of interstate commerce, including email, websites, and social media on the internet.

49.     AmeriStar obtained money from investors by means of the misrepresentations detailed above.

**III. AmeriStar Engaged in Deceptive Conduct.**

50.     AmeriStar employed a scheme to defraud investors and engaged in transactions, practices, and courses of business which would, and did, operate as a fraud or deceit on investors through the conduct described above—materially false and misleading statements about the use of investor money and AmeriStar's misuse of investor money—as well as the following additional acts:

**A. Deceptive Conduct Involving AmeriStar's Purported Executives and Leadership**

51.     AmeriStar falsely touted that two purportedly seasoned financial professionals— Eddie Britton and Therese Hoard—held leadership positions at the company.

52.     Regarding Mr. Britton:

  a.     One version of the PPM that was available on the AmeriStar Website identified Eddie Britton as the "President" of AmeriStar, and stated that Mr. Britton, "*is a seasoned finance professional with a Bachelor's degree from Berkley [sic] University. With a decade-long tenure at JP Morgan Chase, he honed his expertise in various financial instruments and strategies. Transitioning to Resona Bank in Japan, Eddie specialized in trade settlement transactions ….*"

b.    At least some of AmeriStar's subscription agreements and promissory notes were purportedly signed by Eddie Britton on behalf of AmeriStar.

c.    An August 9, 2023, an AmeriStar press release identified Eddie Britton as "*Managing Partner at AmeriStar Investment*" and attributed to him the quote: "*We are thrilled to be providing this option to investors. It's really time to make sure that at least part of your portfolio is secure, and that is what our product does.*"

53.    However, Mr. Britton has never been and is not associated with AmeriStar in any capacity, never signed any documents on behalf of AmeriStar, and AmeriStar's claims about his background were not accurate.

54.    Regarding Ms. Hoard, another version of the PPM that was available on the AmeriStar Website identified her as a "Director" of AmeriStar, and stated that she: "*holds a Master's degree in Finance from Columbia University and a Bachelor's degree in Accounting from the University of California, Los Angeles*[]" and that she "*has held various senior positions in major financial institutions, including JP Morgan Chase and Goldman Sachs.*"

55.    However, Ms. Hoard has never been and is not associated with AmeriStar in any capacity and AmeriStar's claims about her background were not accurate.

56.    In addition to stealing the identity of Mr. Britton and Ms. Hoard, AmeriStar's conduct is deceptive for the additional reason that AmeriStar does not disclose the Unknown Actors who control and operate AmeriStar.

57.    AmeriStar's theft of Mr. Britton's and Ms. Hoard's identities operate as part of a scheme by AmeriStar and the Unknown Actors who control and operate AmeriStar to evade

responsibility for what AmeriStar and the Unknown Actors have falsely told investors about the use of their funds and responsibility for what they did with those funds.

**B. Deceptive Conduct Involving Relationships with Banks**

58.     In its Investor Brochure, AmeriStar stated in its Investor Brochure that it "work[ed] with" specific banks and listed the logos for four well-known banks.

59.     This was deceptive because AmeriStar did not work with these banks to purchase CDs or to operate its "courtesy deposit" program.

60.     On or about January 18, 2024, a well-known bank sent AmeriStar a letter demanding that AmeriStar immediately cease using its tradename and trademark on AmeriStar's Website and in marketing materials, and further stating that the inclusion of the bank's tradename and trademark on AmeriStar's Website "falsely suggests the existence of a professional relationship."

61.     On or about March 25, 2024, another well-known bank sent AmeriStar a letter demanding that AmeriStar immediately cease using its tradename and trademark on AmeriStar's Website and in its marketing materials.

**C. Deceptive Conduct Involving SEC Registration**

62.     While AmeriStar promissory notes and a PPM explained that AmeriStar's promissory notes were not registered pursuant to the Securities Act, AmeriStar told investors and potential investors that *AmeriStar itself* was registered with the SEC. Specifically:

  a.     In the AmeriStar Instagram profile header, AmeriStar stated, "*AmeriStar is a SEC registered Regulation D private fund, providing High Yield Certificates of Deposit for accredited investors.*"

       b.     In a section titled "AmeriStar Story" on the AmeriStar Website, AmeriStar stated that "*[a]s a FinTech AmeriStar is registered ... through the SEC for all Regulation D 506 investments offered.*"

       c.     The Investor Brochure, which was available on the AmeriStar Website, stated "*SEC ... Registered[.] ... As a Fintech company, AmeriStar [sic] is registered ... through the SEC for all investment opportunities.*"

63.     However, AmeriStar is not and was not at any time registered with the SEC. Likewise, no securities offering of AmeriStar was registered with the SEC.

64.     The SEC's Electronic Data Gathering, Analysis, and Retrieval system ("EDGAR") is the primary system for companies and others to submit documents under the Securities Act and the Exchange Act. As of August 27, 2024, the only public Ameristar filing listed in the EDGAR system was a Form D "Notice of Exempt Offering of Securities" dated August 2, 2023. A Form D is used to file a notice of an *exempt* offer of securities with the SEC—its purpose is therefore to notify the SEC of an *unregistered* offering. Filing a Form D does not indicate that a company or its securities is registered with the SEC.

**D. Deceptive Conduct Involving AmeriStar's Submissions to the SEC**

65.     AmeriStar submitted a fraudulent Form D to the SEC.

66.     A completed Form ID, Uniform Application for Access Codes ("Form ID") is required to obtain access to EDGAR. EDGAR access is necessary to file a Form D.

67.     On or about July 28, 2023, AmeriStar submitted a Form ID to the SEC.

68.     The Form ID submitted by AmeriStar purports to be signed on behalf of AmeriStar by Eddie Britton. The Form ID listed him as a "Contact for SEC Account Information and Billing Invoices."

69.     Mr. Britton did not sign the Form ID. Mr. Britton is not and was never associated with AmeriStar in any way.

70.     On or about August 2, 2023, AmeriStar submitted a Form D to the SEC through the EDGAR system. AmeriStar touted the fact that it filed a Form D to investors in its Investor Brochure, social media posts, and on the AmeriStar Website. The Form D listed Mr. Britton as an Executive Officer of AmeriStar, and the Form D submitted by AmeriStar purports to be e-signed by Mr. Britton.

71.     Mr. Britton was never and is not an executive of or otherwise affiliated with AmeriStar, and he did not sign the Form D.

72.     The Form D also listed Therese Hoard as a director of AmeriStar.

73.     Ms. Hoard was never and is not a director of or otherwise affiliated with AmeriStar.

74.     The Form D stated that AmeriStar's principal place of business is 1712 Pioneer Ave, Ste 500, Cheyenne, Wyoming 82001. AmeriStar does not conduct business at this address.

75.     The Form D is deceptive because it falsely seeks to assure investors that AmeriStar is registered with the SEC. It is deceptive for the additional reason that it is meant to obscure and conceal the Unknown Actors who control and operate AmeriStar and to evade responsibility for AmeriStar's conduct.

**IV. AmeriStar Conducted an Unregistered Securities Offering.**

**A. The Investments Offered and Sold by AmeriStar Were Securities.**

76.     AmeriStar offered and sold notes, which are "securities" as defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act [15 U.S.C. §§ 77b(a)(1) and 78c(a)(10)].

77.     Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other things, any "note." The promissory notes sold by AmeriStar are "notes" within the meaning of Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.

78.     Investors were primarily interested in the high interest rate promised by AmeriStar under its purported "courtesy deposit" program. Investors understood that AmeriStar would be using their money in the "courtesy deposit" program to generate profit and a reasonable investor would view this opportunity as an investment.

79.     AmeriStar stated that it was offering securities in the August 2, 2023, Form D submitted to the SEC. AmeriStar claimed in that form that it is a pooled investment fund that was offering equity securities (not notes) for sale with a total offering amount of $10 million. AmeriStar claimed in that form an exemption from the securities registration requirements based on Rule 506(b).

80.     AmeriStar described the "courtesy deposit" program in the PPM as "the Regulation D 506(b) side" of the investment.

81.     The PPM stated that the investments offered by AmeriStar were unregistered, unsecured securities in the form of notes, including by stating that "*AmeriStar … is offering by means of this [PPM] a minimum of Two Hundred (200) and a maximum of Ten Thousand (10,000) Unsecured Promissory Notes ("Notes") …. THE SECURITIES OFFERED HEREBY ARE SPECULATIVE…*"

**B.  AmeriStar's Securities Offering Was Not Registered.**

82.     Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)], make it unlawful for any person, directly or indirectly, to use interstate commerce or the mails, to sell a

security unless a registration statement is in effect as to the security, or to offer to sell a security unless a registration statement has been filed as to such security.

83.    AmeriStar offered and sold securities in the form of promissory notes to the general public by using the means or instruments of interstate commerce, including but not limited to telephones and the Internet.

84.    At all times relevant to the offers and sales of securities described above, there was no registration statement filed or in effect as to such securities.

85.    AmeriStar did not take reasonable steps to verify that all purchasers were accredited, and AmeriStar offered and sold securities to at least two individuals who do not believe they are accredited at the time of their investments.

**V.  AmeriStar MK and Freitag Received AmeriStar Investor Funds and HighLine Received Assets Stemming from AmeriStar Investor Funds.**

86.    AmeriStar used Freitag and another entity ("Paymaster") to collect and disburse investor funds.

87.    Freitag opened and controlled accounts in the name of AmeriStar MK, which has received investor funds. Freitag also received investor funds in his law firm's Interest on Lawyers' Trust Account ("IOLTA").

88.    Paymaster is a limited liability company that opened and controlled at least one bank account that received AmeriStar investor funds.

89.    A Paymaster account received over $1.8 million from AmeriStar investors between March 4, 2024, and March 25, 2024. On the same day that the SEC served subpoenas on AmeriStar and Freitag, among others, April 11, 2024, nearly all those funds were transferred to a bank account opened and controlled by Freitag.

90.    Between approximately April 3 and May 16, 2024, a net of approximately $2 million in investor funds was transferred from an account controlled by Freitag to precious metal dealers. Those payments were used to purchase precious metals, which were then stored in accounts controlled by HighLine Gold, were shipped to HighLine Gold, or both. The current location of these precious metals is unknown to the SEC.

91.    Neither AmeriStar nor the Relief Defendants used investor funds deposited into these accounts to purchase CDs.

92.    While Freitag purports to have provided some services to AmeriStar and received some compensation for those services, he did not provide goods or services for the large majority of investor funds deposited into accounts that he controlled.

93.    AmeriStar MK and HighLine received proceeds from AmeriStar's fraud for which it provided no reciprocal goods or services, and to which they have no legitimate claim.

**FIRST CLAIM FOR RELIEF**
***Violations of Section 10(b) of the Exchange Act and Rule 10b-5***
***[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]***
***(Against AmeriStar)***

94.    The SEC realleges and incorporates by reference above paragraphs 1 through 93.

95.    AmeriStar, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly and recklessly:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

96.     By engaging in the conduct described above, AmeriStar violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### *Violations of Sections 17(a) of the Securities Act*
### *[15 U.S.C. § 77q(a)]*
### (*Against AmeriStar*)

97.     The SEC realleges and incorporates by reference above paragraphs 1 through 96.

98.     AmeriStar directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, knowingly, recklessly, and negligently: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

99.     By engaging in the conduct described above, AmeriStar violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF
### *Violations of Sections 5(a) and 5(c) of the Securities Act*
### *[15 U.S.C. §§ 77e(a) and 77e(c)]*
### (*Against AmeriStar*)

100.    The SEC realleges and incorporates by reference above paragraphs 1 through 99.

101.    AmeriStar directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of a security, offered

and sold securities or carried or caused such securities to be carried through the mails or in

interstate commerce, for the purpose of sale or delivery after sale, when no registration statement

had been filed or was in effect as to such securities.

102.    By engaging in the conduct described above, AmeriStar violated, and unless

restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15

U.S.C. §§ 77e(a) and 77e(c)].

### FOURTH CLAIM FOR RELIEF
*Equitable Disgorgement*
*(Against Relief Defendants)*

103.    The SEC realleges and incorporates by reference above paragraphs 1 through 102.

104.    Relief Defendants obtained money, property, and assets which are the proceeds, or

are traceable to the proceeds, of the violations of the securities laws by AmeriStar.

105.    Relief Defendants received these funds and assets under circumstances in which it

is not just, equitable, or conscionable for them to retain the funds or assets, or the benefit of the

funds or assets, and therefore have been unjustly enriched.

### PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Find that AmeriStar committed the violations alleged in this Complaint.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil

Procedure, temporarily, preliminarily, and permanently enjoining AmeriStar from violating

Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## III.

Order AmeriStar and each of the Relief Defendants to disgorge all ill-gotten gains from the violations alleged in this Complaint and order them to pay prejudgment interest on such ill-gotten gains.

## IV.

Order AmeriStar to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] in an amount to be determined by the Court.

## V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant such other and further relief as this Court may determine to be just and necessary.

## **JURY DEMAND**

The SEC demands a trial by jury on all issues triable to a jury.

Dated September 4, 2024.

Respectfully submitted,

ERIC J. HEIMANN
Acting United States Attorney

By: _____

C. LEVI MARTIN
Assistant United States Attorney

JODANNA L. HASKINS
TERRY R. MILLER
United States Securities and Exchange Commission

*Attorneys for Plaintiff*