ERIC J. HEIMANN
Acting United States Attorney
C. LEVI MARTIN (WY Bar #6-3781)
Assistant United States Attorney
P.O. Box 668
Cheyenne, WY 82003
Telephone: (307) 772-2124
christopher.martin@usdoj.gov

JODANNA L. HASKINS (Pro Hac Vice *pending*)
TERRY R. MILLER (Pro Hac Vice *pending*)
United States Securities and Exchange Commission
1961 Stout Street, 17th Floor
Denver, Colorado 80294
Telephone: (303) 844-1000
haskinsjo@sec.gov
millerte@sec.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | |
| AMERISTAR, LLC, | |
| Defendant, | Civil No. 2:24-cv-00169-KHR |
| and | |
| AMERISTAR MK Ltd. Liability Company, FRED W. FREITAG IV, and HIGHLINE GOLD INC. a/k/a HIGHLINE GOLD LLC a/k/a HIGHLINE GOLD CORPORATION LLC, | |
| Relief Defendants | |

## PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S EMERGENCY MOTION FOR A RULE 65(b)(1) TEMPORARY RESTRAINING ORDER, ASSET FREEZE, AND OTHER EMERGENCY RELIEF AND BRIEF IN SUPPORT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................1

STATEMENT OF FACTS .....................................................................................3

I.     SUMMARY OF AMERISTAR'S SOLICITATION OF SECURITIES ...........3

II.    AMERISTAR, UNKNOWN ACTORS, AND RELIEF DEFENDANTS .........5

III.   AMERISTAR MADE FALSE AND MISLEADING STATEMENTS IN
       CONNECTION WITH THE OFFER AND SALE OF SECURITIES .............6

       A.    The Offering Materials claimed AmeriStar would use investor funds to
             purchase FDIC-insured CDs ...................................................................7

       B.    AmeriStar's statements that it would use investor funds to purchase
             FDIC-insured CDs were false and misleading.........................................8

IV.    AMERISTAR ENGAGED IN ADDITIONAL FRAUDULENT AND
       DECEPTIVE CONDUCT IN CONNECTION WITH THE OFFER OR
       SALE OF SECURITIES...............................................................................11

       A.    Deceptive use of aliases for AmeriStar's executives and leadership....................11

       B.    Deceptive conduct involving relationships with banks .........................................13

       C.    Deceptive conduct involving SEC registration......................................................14

       D.    AmeriStar made false submission to the SEC ......................................................15

ARGUMENT .......................................................................................................16

I.     LEGAL STANDARD FOR THE SEC TO OBTAIN A TEMPORARY
       RESTRAINING ORDER AND ASSET FREEZE.........................................16

       A.    Irreparable injury: There is a high risk that future and current investors will
             lose their money without a restraining order and asset freeze ...............................17

       B.    Success on the merits: The SEC will succeed on the merits of its fraud
             claims against AmeriStar and its claims for disgorgement against
             Relief Defendants...............................................................................21

             1.    AmeriStar made materially false and misleading statements and
                   omissions violating Section 10(b) and Rule 10b-5(b) of the Exchange
                   Act and Section 17(a)(2) of the Securities Act .........................................22

a.    AmeriStar made materially false and misleading statements and omissions and obtained "money or property" .........................22

b.    AmeriStar acted with scienter and negligently .............................24

c.    AmeriStar's misconduct satisfies the "in connection with" and "in the offer or sale" requirements ................................................26

2.    AmeriStar violated Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act and Section 17(a)(1) and (3) of the Securities Act ............29

3.    Relief Defendants received ill-gotten gains and have no legitimate claim to those funds ....................................................................................31

C.    The threatened injury to investors outweighs any potential injury to AmeriStar ................................................................................................32

D.    The requested relief is not adverse to the public interest .......................................33

II.    REQUESTED TEMPORARY RELIEF ........................................................................34

A.    The Court should enter appropriate injunctive orders ...........................................34

B.    The Court should immediately freeze AmeriStar's and Relief Defendants' assets to prevent further dissipation of investor funds ...........................................35

III.    ANCILLARY RELIEF TO AID THE TEMPORARY INJUNCTIVE RELIEF .............37

A.    The Court should order a sworn accounting from AmeriStar and Relief Defendants to locate assets and determine the amount each obtained from the fraud ........................................................................................................37

B.    The Court should order expedited discovery and alternative means of service to prepare for a preliminary injunction hearing ....................................................38

C.    The Court should order AmeriStar and Relief Defendants to preserve evidence ..................................................................................................................38

D.    Emergency temporary relief is warranted under Rule 65(b) .................................39

CONCLUSION ..........................................................................................................................39

## Cases

*Aaron v. SEC,*
   446 U.S. 680 (1980) ................................................................................. 30

AmeriStar. *Adams v. Kinder-Morgan, Inc.,*
   340 F.3d 1083 (10th Cir. 2003) ............................................................... 26

*Basic v. Levinson,*
   485 U.S. 224 (1988) ................................................................................. 23

*Centra, Inc. v. Chandler Ins. Co.,*
   Ltd., 2000 WL 1277672 (10th Cir. Sept. 7, 2000) ................................. 25

*City of Phila. v. Fleming Companies, Inc.,*
   264 F.3d 1245 (10th Cir. 2001) ........................................................ 23, 24

*Cloud Peak Energy Inc. v. United States Department of Interior,*
   415 F. Supp. 3d 1034 (D. Wyo. 2019) .................................................... 18

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,*
   356 F.3d 1256 (10th Cir. 2004) ............................................................... 17

*DTC Energy Group, Inc. v. Hirschfeld,*
   912 F.3d 1263 (10th Cir. 2018) ......................................................... 18-19

*Ernst & Ernst v. Hochfelder,*
   425 U.S. 185 (1976) ................................................................................. 24

*FTC v. Affordable Media, Inc.,*
   179 F.3d 1228 (9th Cir. 1999) ................................................................. 33

*FTC v. Skybiz.com, Inc.,*
   No. 01-CV-396-K(E), 2001 WL 1673645 (N.D. Okla. Aug. 31, 2001),

*FTC v. Skybiz.com, Inc.,*
   57 F. App'x 374 (10th Cir. 2003) ............................................................ 33

*Geman v. SEC*
   ., 334 F.3d 1183 (10th Cir. 2003) ........................................................... 22

*Janus Capital Group, Inc. v. First Derivative Traders,*
   564 U.S. 135 (2011) ................................................................................. 23

*Lorenzo v. SEC,*
   587 U.S. 71 (2019) ................................................................................... 30

*Mrs. Fields Franchising, LLC v. MFGPC,*
   941 F.3d 1221 (10th Cir. 2019) ........................................................ 16, 17

*New Mexico Dep't of Game & Fish v. United States Dep't of the Interior*,
854 F.3d 1236 (10th Cir. 2017) ................................................. 17

*Reves v. Ernst & Young*,
494 U.S. 56 (1990) ................................................. 27, 28

*SEC v. C. Jones & Co.*,
312 F. Supp. 2d 1375 (D. Colo. 2004) ................................................. 22

*SEC v. Cavanagh*,
155 F.3d 129 (2d Cir. 1998) ................................................. 21

*SEC v. Cell>Point, LLC*,
No. 21-cv-01574, 2022 WL 2716549 (D. Colo. July 13, 2022) ................................................. 27

*SEC v. Cell>Point, LLC*,
No. 21-cv-1574-PAB-KLM, 2022 WL 444397 ................................................. 16

*SEC v. Chappell*,
107 F.4th 114, 126-129 (3d Cir. 2024) ................................................. 16, 19

*SEC v. Collyard*,
861 F.3d 760 (8th Cir. 2017) ................................................. 35

*SEC v. Cooper*,
142 F. Supp. 3d 302 (D.N.J. 2015) ................................................. 31

*SEC v. Credit Bancorp Ltd.*,
No. 99-cv-11395, 2010 WL 768944 (S.D.N.Y. Mar. 8, 2010) ................................................. 19, 20

*SEC v. Digital Licensing Inc.*,
No. 23-cv-482-RJS-DBP, 2023 WL 8283613 (D. Utah, Nov. 23, 2023) ................................................. 16

*SEC v. End of Rainbow Partners, LLC*,
No. 17-cv-02670-MSK, 2017 WL 5404199 (D. Colo. Nov. 14, 2017) ............... 19, 34, 35-36

*SEC v. Erwin*,
553 F. Supp. 3d 895 (D. Colo. 2021) ................................................. 21, 31, 37

*SEC v. Estates of Swensen*,
No. 22-cv-00135, 2024 WL 327958 (D. Utah, Jan. 29, 2024) ................................................. 36, 37

*SEC v. George*,
426 F.3d 786 (6th Cir. 2005) ................................................. 24

*SEC v. Harkins*,
No. 19-cv-2418, 2022 WL 3597453 ................................................. 36

*SEC v. Hartman Wright Group, LLC, 19-cv-2418-PAB-KMT*,
2020 WL 8186477 ................................................. 28

*SEC v. Int'l Swiss Inv. Corp.*,
  895 F.2d 1272 (9th Cir. 1990) ............................................... 37

*SEC v. Kokesh*,
  834 F.3d 1158 (10th Cir. 2016) .............................................. 35

*SEC v. Manor Nursing Centers, Inc.*,
  458 F.2d 1082 (2d Cir. 1972) ................................................ 19

*SEC v. McDuffie*,
  No. 12-cv02939, 2014 WL 4548723 (D. Colo. Sept. 15, 2014) ............. 30

*SEC v. McLellan*,
  No. CV 16-10874-DPW, 2024 WL 3030421 (D. Mass. June 17, 2024) .......... 35

*SEC v. Meltzer*,
  440 F. Supp. 2d 179 (E.D.N.Y. 2006) ........................................ 23

*SEC v. Milan Cap. Grp., Inc.*,
  2000 WL 1682761 (S.D.N.Y. Nov. 9, 2000) ................................... 29

*SEC v. Mine Shaft Brewing LLC*,
  No. 21-cv-457-DBB-JCB, 2023 WL 6541552 (D. Utah, 2023) ................. 24

*SEC v. One or More Unknown Traders in Common Stock of Certain Issuers*,
  No. 08-CV-1402 (KAM)(JMA), 2009 WL 3233110 (E.D.N.Y. Oct. 2, 2009) .... 29

*SEC v. Radius Capital Corp.*,
  653 Fed. Appx. 744 (11th Cir. 2016) ........................................ 29

*SEC v. Reliable One Res., Inc.*,
  No. 23-cv-00006, 2023 WL 177687 ............................................ 34

*SEC v. Reven Holdings, Inc.*,
  2024 WL 1675677 ........................................................ 26, 36

*SEC v. Reven Holdings, Inc.*,
  No. 22-cv-03181-DDD-KLM, 2024 WL 3714389 .................................. 17

*SEC v. Sethi Petroleum, LLC*,
  No. 15-cv-338, 2015 WL 11197824 ............................................ 34

*SEC v. Shields*,
  No. 11-cv-02121-REB, 2011 WL 3799061 (D. Colo. Aug. 26, 2011) ......... 38

*SEC v. Spongetech Delivery Sys., Inc.*,
  No. 10-CV-2031 (DLI)(JMA), 2011 WL 887940 (E.D.N.Y. Mar. 14, 2011) ... 37-38

*SEC v. Thompson*,
  732 F.3d 1151 (10th Cir. 2013) ............................................. 27

v

*SEC v. Universal Consulting Res. LLC*,
    No. 10-CV-02794-JLK-KLM, 2010 WL 4873733 (D. Colo. Nov. 23, 2010) .......... 37, 38, 39

*SEC v. Wencke*,
    622 F.2d 1363 (9th Cir. 1980) ............................................................................. 19

*SEC. v. Mantria Corp.*,
    No. 09-cv-02676-CMA-MJW, 2009 WL 4693893 (D. Colo. Dec. 2, 2009) ................. 38, 39

*SEC. v. Smart*,
    678 F.3d 850 (10th Cir. 2012) ...................................................... *passim*

*Smith v. SEC*,
    653 F.3d 121 (2d Cir. 2011) ............................................................................. 37

*Starbucks Corp. v. McKinney*,
    144 S. Ct. 1570 (2024) ............................................................................. 16

*Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*,
    805 F.2d 351 (10th Cir. 1986) ............................................................................. 19

*United States v. First Nat'l City Bank*,
    379 U.S. 378 (1965) ............................................................................. 19

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................. 17

## Statutes, Rules, Other

15 U.S.C. § 77b ............................................................................. 26

15 U.S.C. § 77q ............................................................................. 22

15 U.S.C. § 77q, Section 10(b) .................................................... 2, 30, 35

15 U.S.C. § 77t, and Section 21(d) ............................................. 16

15 U.S.C. § 78j ............................................................................. 2, 35

15 U.S.C. § 78u ............................................................................. 16

15 U.S.C. §§ 77q and (3) ............................................................. 29

Federal Rule of Civil Procedure 65 ............................................. 2

Federal Rule Civil Procedure. 83 ............................................... 30

17 C.F.R. § 240.10b-5 .............................................................. *passim*

17 C.F.R. § 240.10b-5 and (c) ................................................... 29

## INDEX OF EXHIBITS TO BRIEF

| EXHIBIT | DESCRIPTION |
| --- | --- |
| 1 | Financial Account Summaries<br>- Consolidated Summary by Account<br>- Investor Transaction Summary |
| 2 | AmeriStar Articles of Organization (July 21, 2023) |
| 3 | Capture of the website bankingsecure.app/en/ |
| 4 | AmeriStar Press Release (Aug. 9, 2023) |
| 5 | AmeriStar Form D, Notice of Exempt Offering of Securities (Aug. 2, 2023) |
| 6 | AmeriStar Private Placement Memorandum (captured March 21, 2024) |
| 7 | AmeriStar Private Placement Memorandum (downloaded February 22, 2024) |
| 8 | Capture of the website www.ameristarinvestment.com (February 23, 2024) |
| 9 | Capture of the website www.ameristarinvestment.com (July 18, 2024) |
| 10 | Emails between SEC staff and AmeriStar (Apr. 24, 2024) |
| 11 | Excerpts of investigative testimony transcript of Fred W. Freitag, IV, Esq. (May 8, 2024) |
| 12 | Excerpts of records from Citizens Bank |
| 13 | Business Entity Detail for HighLine Gold Inc. (printed from Wyoming Secretary of State website on June 22, 2024) |
| 14 | Declaration of Eddie Britton, with Exhibits (July 8, 2024) |
| 15 | Excerpts of the website www.backedgold.com (captured Mach 8, 2024) |
| 16 | HighLine Form D, Notice of Exempt Offering of Securities (June 7, 2023) |
| 17 | Excerpts of records produced by Manufactures and Traders Trust Company ("M&T Bank") |
| 18 | IRC Articles of Organization (Apr. 22, 2024) |
| 19 | Declaration of Daren Wood (Aug. 16, 2024), with Exhibits |
| 20 | Retainer Agreement between AmeriStar and Fred W. Freitag, IV (Oct. 30, 2023) |
| 21 | InvestNext "chat" with Eddie Britton |
| 22 | AmeriStar Blog Post "quoting" Eddie Britton (Mar. 21, 2024) |
| 23 | Affidavit of Therese Hoard (Feb. 14, 2024) |
| 24 | Declaration of Therese Hoard (Aug. 5, 2024), with Exhibits |
| 25 | AmeriStar Form ID (July 28, 2023) |

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 26 | AmeriStar Investor Brochure |
| 27 | Excerpt of "certificates-of-deposit" page of the AmeriStar Website (captured June 17, 2024) |
| 28 | AmeriStar Instagram (captured Feb. 23. 2024) |
| 29 | AmeriStar Facebook (captured Feb. 23, 2024) |
| 30 | Excerpts of documents produced by GoDaddy regarding hosting of AmeriStar and Banking Secure Website |
| 31 | Captures from the Internet Archive regarding the AmeriStar Website |
| 32 | Captures from the Internet Archive regarding the Banking Secure Website |
| 33 | Email from info@ameristarinvestment.com to potential investor and "Client Representative" (Sept. 21, 2023), including attachments |
| 34 | Emails between potential investor and cr@ameristarinvestment.com (Jan. 30, 2024) |
| 35 | Declaration of John Hermansen (Aug. 15, 2024), with Exhibits. |
| 36 | Excerpts of records from KeyBank |
| 37 | Consolidated exhibit with excerpts of records from Novo and Middlesex Federal Savings, F.A. |
| 38 | Excerpts of records from First National Bank of Pennsylvania |
| 39 | Excerpts of documents from Fisher PM |
| 40 | Excerpts of documents from IDS Texas |
| 41 | Excerpts of documents from JM Bullion |
| 42 | FDIC Press Release (Mar. 19, 2024), attaching letter to AmeriStar and HighLine (Mar. 18, 2024) |
| 43 | PNC Bank cease-and-desist letter |
| 44 | Printout from EDGAR system for AmeriStar (printed on June 20, 2024) |
| 45 | Excerpts of documents produced by Launch Management Company, LLC |
| 46 | Declaration of David Nelson (Aug. 16, 2024), with Exhibits |
| 47 | IRC Paymaster Agreement |
| 48 | AmeriStar Facebook (captured Aug. 21, 2024) |
| 49 | Emails between Freitag and info@ameristar.com |
| 50 | AmeriStar Instagram (captured Aug. 29, 2024) |

## INTRODUCTION

The SEC brings this emergency enforcement action to stop an ongoing fraudulent scheme being carried out by AmeriStar through one or more individuals who are unknown to the SEC. These hidden actors caused AmeriStar to fraudulently raise millions of dollars and are causing AmeriStar to continue to advertise its fraudulent investments to the public.

AmeriStar falsely promised investors an income stream derived from a program involving certificates of deposit ("CDs"). In materials that were publicly available until recently, AmeriStar claimed it was using investor funds to generate profits based on the combination of returns on CDs purportedly insured by the Federal Deposit Insurance Corporation ("FDIC"), and fees paid to AmeriStar by borrowers who AmeriStar purportedly helps get loans from banks by increasing the borrower's creditworthiness. AmeriStar claimed these investments would earn roughly double the rate of return on a typical CD. AmeriStar has touted its investments on at least two websites and its Facebook and Instagram accounts.

Contrary to what it promised investors, AmeriStar did not use investor funds to purchase CDs. Rather, AmeriStar diverted investor money to bank accounts controlled by Freitag and another entity and then told Freitag what to do with the funds. Large amounts of investor funds were used to purchase precious metals—not CDs—that were ultimately sent to HighLine Gold.

To provide an air of legitimacy to the scheme, AmeriStar also falsely claimed that it works with well-known banks and that it is registered with the SEC. And the unknown actors who operate AmeriStar are obstructing and concealing their true identity by using false identities: they stole and misused the identities of individuals who they claimed were the President and a Director of AmeriStar when in fact neither of these individuals have any affiliation with the company.

Putting a halt to this fraud is crucial to protect investors. AmeriStar has raised over $3.6 million from at least 22 investors. As of July 2024, it is no longer answering phone calls from investors or returning their emails, and as of at least August 19, 2024, it has taken down one of its websites. But AmeriStar's Facebook and Instagram accounts, as well as at least one website, continue to advertise AmeriStar's investments to the public.

To stop this fraud and preserve the status quo by preventing further fraudulent solicitations and preserving any existing investor assets, the SEC brings this emergency action under Federal Rule of Civil Procedure 65(b)(1) to request that the Court enter an order:

1)      temporarily restraining AmeriStar from violating Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, by engaging in the type of conduct described in the Complaint;

2)      temporarily restraining AmeriStar from continuing to solicit, accept, or deposit additional funds from investors;

3)      requiring that websites and Facebook and Instagram accounts associated with AmeriStar that are soliciting investors be taken down immediately and that they, along with websites previously used by AmeriStar, remain down;

4)      temporarily freezing assets and funds of AmeriStar up to $3,773,245.46, which represents the amount AmeriStar raised from investors plus prejudgment interest;

5)      temporarily freezing assets and funds of Relief Defendants up to: $1,231,000.41 for AmeriStar MK, Ltd Liability Company, $448,841.14 for Fred Freitag; and $2,074,557.95 for HighLine Gold Inc.; all of which represents the amount of investor funds each Relief Defendant received that was not transferred to another Relief Defendant, plus prejudgment interest;

    6)        requiring an accounting by AmeriStar and Relief Defendants;

    7)        permitting expedited discovery;

    8)        prohibiting AmeriStar and Relief Defendants from the alteration or destruction of evidence;

    9)        permitting alternative means of service; and

    10)      setting a preliminary injunction hearing requiring AmeriStar and Relief Defendants to show cause why the order should not continue until resolution of the merits of the litigation.

## STATEMENT OF FACTS

## I.    SUMMARY OF AMERISTAR'S SOLICITATION OF SECURITIES

Beginning in August 2023 and continuing today, AmeriStar offers investments to the public through social media accounts, and until August 2024, it also did so through at least two websites. Declaration of Danielle R. Voorhees, ¶ 44 ("Voorhees Dec."). AmeriStar attracts investors with advertisements on Facebook and Instagram accounts. *Id.* at ¶¶ 45-46; **Exhibit 19,**[1] Declaration of Daren Wood ¶¶ 2-3 ("Wood Dec."); **Exhibit 35,** Declaration of John Hermansen ¶¶ 2-3 ("Hermansen Dec."); **Exhibit 46,** Declaration of David Nelson ¶¶ 2-3 ("Nelson Dec.").

AmeriStar previously used a website ("AmeriStar Website") that was available to the public as recently as of about August 18, 2024, which contained marketing materials, including an investor brochure ("Investor Brochure") and at least two versions of a private placement memorandum ("PPM"). Voorhees Dec. ¶ 47; *see also id.* ¶ 9 (website and PPMs) and ¶ 40 (Investor Brochure). AmeriStar also solicited investors through another website with the address of bankingsecure.app/en/ ("Banking Secure Website"). Voorhees Dec. ¶ 48; *see also id.* ¶ 9.

---

[1] Citations to exhibits in this motion refer to the exhibits of the Declaration of Danielle R. Voorhees, which is filed concurrently with this motion.

While occasionally inaccessible, the Banking Secure Website appeared accessible on September 3, 2024. Voorhees Dec. ¶ 9 & n.2. Collectively, these materials are referred to as the "Offering Materials."

Through these channels, AmeriStar claimed that it offered high yield, FDIC-insured investments. Voorhees Dec. ¶¶ 63-70. The AmeriStar Website claimed that it was offering securities that combined the return from its purchase of CDs with fees from its purported "courtesy deposit" program. *Id.* at ¶ 40. AmeriStar told investors that they could essentially double the typical rate of return for a CD by investing with AmeriStar's "courtesy deposit" program because AmeriStar would both purchase the CD (which would generate interest payments), and also use that CD to generate a fee from businesses looking to borrow money from a bank. *Id.* at ¶¶ 41-43. These businesses would purportedly pay AmeriStar this fee if AmeriStar would purchase CDs from a bank because, AmeriStar claimed, its "courtesy deposit" would cause the bank to look favorably on the business's loan application. *Id.* at ¶¶ 41-43.

For example, the AmeriStar Website stated: "*AmeriStar combines a Certificate of Deposit and a Courtesy Deposit, to generate two returns*," and in response to a "Frequently Asked Question" that the investment seems too good to be true, the website explained, "*Well you are right, no FDIC bank could ever have interest of 12% in this market. But AmeriStar is not providing a CD at 12%. The investment is into a Regulation D private offering that combines a CD and a Courtesy Deposit.*" *Id.* at ¶ 41. AmeriStar bolstered the "courtesy deposit" program by claiming that AmeriStar would purchase CDs in a way to ensure that insurance provided by the FDIC would protect all investor funds. *Id.* at ¶¶ 63-70.

AmeriStar offered and sold these investments in the form of notes, *id.* at ¶¶ 54-55, which are securities under federal law as explained below. These notes stated that repayment of the

principal investment is due by a certain date and that AmeriStar will make monthly interest payments based on a specified annualized rate of return. *Id.* at ¶ 56.

This scheme, which involves the ongoing solicitation of investors on social media, is a fraud. AmeriStar did not purchase the CDs for investors or make "courtesy deposits" for those investors like it said it would: AmeriStar bank records do not reflect the purchase of CDs from the specific banks identified in its offering materials. *Id.* at ¶¶ 79-81; *see also id.* ¶¶ 57-62. Instead, investor money flowed into accounts of Relief Defendants and a large amount of investor money was sent to companies that sell precious metals. *Id.* at ¶ 59.

## II.   AMERISTAR, UNKNOWN ACTORS, AND RELIEF DEFENDANTS

**Defendant AmeriStar** and **Unknown Actors**. AmeriStar is a Wyoming LLC that was organized on or about July 21, 2023, by an individual at a law firm in Wyoming. Voorhees Dec. ¶ 9. AmeriStar has claimed to have business addresses in Sheridan, Wyoming, at 1712 Pioneer Ave (in various suites), Cheyenne, Wyoming, and Vernon Hills, Illinois. *Id.*

Some individual or individuals are responsible for controlling AmeriStar and directing its conduct. But during the SEC's investigation of AmeriStar, the company has obscured and lied about the identity of individuals who are responsible for controlling it and causing AmeriStar to engage in the conduct described in this brief, the attached Declaration, and the Complaint. *Id.* at ¶ 21. These "Unknown Actors" have conducted business on behalf of AmeriStar and communicated with SEC staff through deceptive aliases. *Id.* at ¶¶ 21-24, 86-90. Similarly, the Unknown Actors conducting business on behalf of AmeriStar have stopped responding to attempts from investors to contact AmeriStar since at least mid-July 2024. *Id.* at ¶¶ 92-94. Thus, by design, the individual or individuals who manage, own, and control AmeriStar are unknown to the SEC. *Id.* at ¶¶ 21-22.

**Relief Defendant Fred W. Freitag, IV**, is a resident of Gibsonia, Pennsylvania and is an attorney licensed in Pennsylvania. In connection with a bank account at First National Bank of Pennsylvania, Freitag has used the d/b/a "Law Office of Fred Freitag." *Id.* at ¶ 11.

**Relief Defendant AmeriStar MK Ltd. Liability Company a/k/a AmeriStar MK, LLC ("AmeriStar MK")**, is a Wyoming LLC that was organized on or about September 26, 2023, by the same individual that organized AmeriStar. Freitag is the sole member of AmeriStar MK. *Id.* at ¶ 13.

**Relief Defendant HighLine Gold Inc. a/k/a HighLine Gold LLC a/k/a HighLine Gold Corporation LLC ("HighLine Gold")** is a Wyoming corporation that has been administratively dissolved by the Wyoming Secretary of State. *Id.* at ¶ 15. In communicating with one individual about a potential employment opportunity, HighLine Gold used the website "www.backedgold.com" ("HighLine Gold Website"). *Id.* at ¶ 15. The HighLine Gold Website has also been publicly used by an entity calling itself "HighLine Gold LLC." *Id.* at ¶ 16.

HighLine Gold has close business connections to AmeriStar. In a form submitted to the SEC, HighLine Gold claimed to have the same principal place of business as AmeriStar. *Id.* The AmeriStar Website has advertised gold sales by HighLine Gold, and the HighLine Gold Website once advertised AmeriStar's CDs. *Id.* at ¶ 17. Both entities claim to be subsidiaries of the TPA Gold Corporation. *Id.*

## III.   AMERISTAR MADE FALSE AND MISLEADING STATEMENTS IN CONNECTION WITH THE OFFER AND SALE OF SECURITIES.

In the Offering Materials, AmeriStar claimed that it was using investor funds to purchase FDIC-insured CDs, and further claimed that each account was fully insured because it structured CDs so that no account would exceed the $250,000 limit on FDIC insurance. Voorhees Dec. ¶ 63. These statements were false and misleading.

**A.     The Offering Materials claimed AmeriStar would use investor funds to purchase FDIC-insured CDs.**

The AmeriStar Website is hosted by GoDaddy.com and appears to have been used by AmeriStar between at least August 19, 2023 and approximately August 18, 2024. *Id.* at ¶ 47. The AmeriStar Website claimed that all investments are FDIC-insured CDs. *Id.* at ¶ 64. The PPM, which was available on the AmeriStar Website, also claimed that AmeriStar was using investor funds to purchase FDIC-insured CDs. *Id.* at ¶ 65.

Similarly, the Investor Brochure, which was available on the AmeriStar Website, claimed that AmeriStar was using investor funds to buy FDIC-insured CDs:



*Id.* at ¶ 66.

Posts to AmeriStar's social media accounts make similar claims. Since at least August 15, 2023, a Facebook page has advertised AmeriStar's securities to the public. *Id.* at ¶ 46. The AmeriStar Facebook pages includes a link to the AmeriStar Website and the email address info@ameristarinvestment.com. *Id.* at ¶ 46 (the most recent posts on the AmeriStar's Facebook account are from April 2024). The AmeriStar Facebook page included posts claiming that AmeriStar was using investor funds to buy FDIC-insured CDs. *Id.* at ¶ 69.

Similarly, since at least August 11, 2023, an Instagram page has advertised AmeriStar's securities to the public, which also includes a link to the AmeriStar Website. *Id.* at ¶ 45 (the most recent posts on AmeriStar's Instagram account are from April 2024). The AmeriStar Instagram account claimed that AmeriStar was using investor funds to buy FDIC-insured CDs, including, for example, a previous post about 61-month, 49-month, 25-month, and 13-month CDs that stated "*A High Yield Investment with the security of FDIC Insurance. Come and learn what a dual investment income stream can do for your portfolio*." *Id.* at ¶ 70.

Finally, the Banking Secure Website and the HighLine Gold Website also included claims that AmeriStar was using investor funds to buy FDIC-insured CDs. *Id.* at ¶¶ 67-68.

## B. AmeriStar's statements that it would use investor funds to purchase FDIC-insured CDs were false and misleading.

AmeriStar's statements to potential investors that it would use their funds to purchase FDIC-insured CDs were false and misleading. The SEC collected bank records that revealed deposits of substantial amounts of investor funds but did not show that any of those investor funds were used to purchase CDs. *Id.* at ¶¶ 57-62. As explained in more detail below, the following summarizes the primary uses of investor funds reflected in the records obtained by the SEC (*id.* at ¶ 62):

| Transaction Type | Amount |
|---|---|
| **Investor Funds In** | **$3,698,536.37** |
| **Funds Out to Precious Metal Dealers [net]** | ($2,047,171.38) |
| **Apparent Investor Refunds** | ($1,029,801.37) |
| **Funds Out to Other Individuals / Entities [approximate]** | ($300,000) |
| **Funds out to Freitag / Assumed Relative** | ($99,000) |

Receipt of Investor Funds. Rather than AmeriStar itself, third parties received investor funds. Freitag opened and controlled accounts that received investor funds, including:

(i)     at least $822,517.37 from investors into the AmeriStar MK "9873 Account," *id.* at ¶ 57(i);

(ii)    at least $409,000 from investors and another $175,000 that is likely from investors into the AmeriStar MK "0731 Account," *id.* ¶ 57(ii);

(iii)   at least $100,000 from investors into the AmeriStar MK "4165 Account," *id.* ¶ 57(iii); and

(iv)    at least $250,000 from investors and another $60,000 that is likely investor funds into Freitag's law firm's interest on lawyers' trust accounts ("IOLTA") account ("5762 Account"), *id.* ¶ 58(iv).

Another account that received investor funds, the "8573 Account," was opened on or about February 28, 2024. *Id.* at ¶ 61. This account received at least $1,821,965 between March 4 and 25, 2024, from investors. *Id.* at ¶ 61(i). On or about April 11, 2024, nearly all of these funds ($1,819,423.21) were transferred into Freitag's IOLTA account (the 5762 Account) and the 8573 Account appears to have been closed that day. *Id.* at ¶ 61(i).

Use of Investor Funds. Despite receiving investor funds, Freitag testified that he did not purchase any CDs at AmeriStar's direction or even have conversations "with anybody at

AmeriStar about certificates of deposit…." *Id.* at ¶ 60 ("No. The question keeps coming up, uh, uh, about certificates of deposit, and it never came up at all."). Instead, some uses of investor money from accounts controlled by Freitag include the following:

(i)      over $2 million was sent to precious metals dealers, *id.* at ¶¶ 58(iv) and 59;

(ii)     over $1 million in apparent refunds to investors, *see, e.g.*, *id.* ¶ 57(i) and (ii); and

(iii)    $100,000 in payments to Freitag and an individual with the same last name, *id.* ¶ 57(ii).

In addition to the bank records discussed above that show investor funds were used for things *other than* CDs, the SEC also issued subpoenas to the banks that AmeriStar told investors it does business with and requested any information related to the purchase of CDs by AmeriStar at those banks. *Id.* at ¶ 79. Each bank provided no such evidence. *Id.* at ¶¶ 79, 81. The SEC also issued a subpoena to AmeriStar requesting documents about the actual purchase of CDs and, while AmeriStar produced other records, AmeriStar produced no records evidencing the purchase of CDs. *Id.* at ¶¶ 80-81. AmeriStar was obligated to produce evidence that it purchased CDs if such evidence existed, and AmeriStar had every incentive to do so when it produced other documents to the SEC. It is reasonable to infer from Freitag's testimony and the lack of evidence in productions from banks and from AmeriStar that AmeriStar did not use investor money to purchase CDs.

AmeriStar's statements that investor funds would be insured by the FDIC, such as the statements that AmeriStar would stack investments so that no account ever exceeded the $250,000 limit for FDIC insurance, are false for the additional reason that most investor funds were kept in one of two places that did not provide FDIC insurance: (i) accounts with balances

that often exceeded the $250,000 limit for FDIC insurance; and (ii) transfers to precious metal dealers and others who do not provide FDIC insurance.

Finally, while AmeriStar made some payments to certain investors as noted above, AmeriStar recently stopped communicating with investors who are seeking repayment. *Id.* at ¶¶ 92-94; Wood Dec. ¶¶ 10-11; Hermansen Dec. ¶¶ 11-13; Nelson Dec. ¶¶ 11-12.

In sum, AmeriStar's actual use of a large amount of investor funds shows that AmeriStar did not purchase FDIC-insured CDs consistent with its statements to investors with that money. AmeriStar's inability to produce any evidence that it purchased CDs not only corroborates that evidence, but also suggests that AmeriStar misused *all* of the investor funds.

## IV.   AMERISTAR ENGAGED IN ADDITIONAL FRAUDULENT AND DECEPTIVE CONDUCT IN CONNECTION WITH THE OFFER OR SALE OF SECURITIES.

The false and misleading statements described above constitute deceptive conduct. AmeriStar also engaged in additional deceptive conduct when offering and selling securities.

### A.   Deceptive use of aliases for AmeriStar's executives and leadership

Hiding the identity of the Unknown Actors who control AmeriStar is deceptive. *See* Voorhees Dec. ¶¶ 21-22. AmeriStar also falsely identified *real* individuals as holding leadership positions at its company. But those individuals did not have any relationship with the company at all. *Id.* at ¶ 86-90. This bold deception was presumably intended to distract and deter investors and regulators, like the SEC, from asking questions about the true identity of the Unknown Actors that control AmeriStar and perpetrated the fraud. And to do this, AmeriStar did not just falsely list the names of the real individuals whose identity AmeriStar stole—it touted detailed (and false) credentials of the supposed leadership of AmeriStar.

One version of the PPM available on the AmeriStar Website identified Eddie Britton as the "President" of AmeriStar, and stated that Mr. Britton "*is a seasoned finance professional*

11

with a Bachelor's degree from Berkley (sic) University. With a decade-long tenure at JP Morgan Chase, he honed his expertise in various financial instruments and strategies. Transitioning to Resona Bank in Japan, Eddie specialized in trade settlement transactions …." *Id.* at ¶ 87(a). At least some of AmeriStar's Subscription Agreements and Promissory Notes were purportedly signed by Eddie Britton, on behalf of AmeriStar. *Id.* at ¶ 87(b). An August 9, 2023, AmeriStar press release identified Eddie Britton as "*Managing Partner at AmeriStar Investment*" and attributed to him the quote: "*We are thrilled to be providing this option to investors. It's really time to make sure that at least part of your portfolio is secure, and that is what our product does.*" *Id.* at ¶ 87(c).

But Mr. Britton is not associated with AmeriStar in any capacity and the detailed claims about his background are not accurate. **Exhibit 14,** Declaration of Eddie Britton ¶¶ 4-12 ("Britton Dec."); Voorhees Dec. ¶ 90. Mr. Britton applied for a job with HighLine Gold and provided personal information with his application but ultimately did not conduct any business on behalf of HighLine Gold. Britton Dec. ¶¶ 14-22; Voorhees Dec. ¶ 23. Mr. Britton had not even heard of AmeriStar until he received a subpoena from the SEC during its investigation, Britton Dec. ¶¶ 3-4. Voorhees Dec. ¶ 23.

In addition, another version of the PPM available on the AmeriStar Website identified Therese Hoard as a "Director" of AmeriStar, and stated that she, "*holds a Master's degree in Finance from Columbia University and a Bachelor's degree in Accounting from the University of California, Los Angeles*[]" and that she "*has held various senior positions in major financial institutions, including JP Morgan Chase and Goldman Sachs*." Voorhees Dec. ¶ 88. Like Mr. Britton, Ms. Hoard is not associated with AmeriStar and AmeriStar's description of her

background is false. **Exhibit 23,** Affidavit of Therese Hoard ¶ 8 ("Hoard Aff."); **Exhibit 24,**

Declaration of Therese Hoard ¶¶ 2-3 ("Hoard Dec."); Voorhees Dec. ¶ 90.

### B.     Deceptive conduct involving relationships with banks

To bolster the credibility of its "courtesy deposit" program, AmeriStar told investors in

certain Offering Materials that it worked with specific banks familiar to average investors and

consumers. For example, in its Investor Brochure and subscription agreements that at least some

investors signed to invest with AmeriStar, AmeriStar made claims about specific banks,

including:

    a.     The Investor Brochure stated, "*Some of the banks that we work with are below*"

        and included the logo for four banks.

    b.     The Investor Brochure also stated, "*AMERISTAR'S HIGHEST YIELDS YET*

        *WITH CITIZENS BANK!*" in the following graphic:

Combing the
## Dual Investment Income Streams

**Certificate of Deposit**
4% to 6% Yield. FDIC Insured.
The Certificate of Deposit will generate a
consistent, stable yield that is **fixed.**



**Regulation D 506(c)**
5% to 7% Yield. Paid Before Deposit is Made.
This return is completely nondependent on the Borrower
receiving a loan or financing, because the Borrower is
required to pay AmeriStar **before** any courtesy deposit is
made.



Voorhees Dec. ¶ 76.

Creating false impressions of relationships with well-known banks was deceptive.

AmeriStar did not have a relationship with these banks. As explained above, other banks

identified by AmeriStar in certain Offering Materials, as well as AmeriStar itself, did not produce any evidence that AmeriStar purchased CDs at those banks to facilitate the "courtesy deposit" program. *Id.* at ¶¶ 79-81.

At least two banks have sent AmeriStar cease-and-desist letters about AmeriStar's use of their logos. *Id.* at ¶ 77. On or about January 18, 2024, one of the banks mentioned in AmeriStar's offering material sent AmeriStar a letter demanding that AmeriStar "*immediately cease and desist its unauthorized use of [the bank's] trade name and trademark on [the AmeriStar] website and marketing materials accessible thereon.*" *Id.* at ¶ 77(a). The letter explained, "*Your company's inclusion of [the bank's] Marks on your website, in your marketing materials and on your social media accounts falsely suggests the existence of a professional relationship between AmeriStar and [the bank].*" *Id.* at ¶ 77(a). Representatives of the bank confirmed that no CDs had been purchased out of the AmeriStar MK accounts at the bank and added that the AmeriStar MK accounts at the bank had been temporarily frozen because of concerns about fraud. *Id.* at ¶ 78.[2] Similarly, on or about March 25, 2024, another bank also sent AmeriStar a letter demanding that it immediately cease all use of its marks. *Id.* at ¶ 77(b).

### C.    Deceptive conduct involving SEC registration

AmeriStar also tried to bolster its credibility by claiming it was registered with the SEC. Certain Offering Materials, including promissory notes and a PPM, explained that AmeriStar's promissory notes were not registered under the Securities Act. *Id.* at ¶ 84. But in other materials available to investors and potential investors, AmeriStar stated that *AmeriStar itself* was registered with the SEC. *Id.* at ¶ 82.

---

[2] The SEC staff understands that Citizens Bank continues to hold approximately $130,000 of the funds in two accounts owned by AmeriStar MK.

AmeriStar's claim that it was "registered" with the SEC is deceptive; the only public filing by AmeriStar with the SEC is a form designed to notify the SEC of an <u>unregistered</u> offering. *Id.* at ¶ 85. AmeriStar is not and was at no time registered with the SEC. *See id.* at ¶ 85. Likewise, no securities offering of AmeriStar was registered with the SEC. By design, this deceptive conduct gave investors a false sense of comfort that AmeriStar and its investments were legitimate. *See* Hermansen Dec. ¶ 4.

**D.    AmeriStar made false submissions to the SEC.**

AmeriStar engaged in further deceptive conduct when making false submissions to the SEC. On or about July 28, 2023, AmeriStar submitted a Form ID to gain access to file on the Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") sytem, a system for companies and others submitting documents under the Securities Act and the Exchange Act, among others. Voorhees Dec. ¶¶ 25, 34. This form was purportedly signed by Mr. Britton, and the form listed him as a "Contact for SEC Account Information and Billing Invoices." *Id.* at ¶ 34. But Mr. Britton did not sign the Form ID. Britton Dec. ¶ 7 ("I have never signed any documents on behalf of AmeriStar. Specifically, I have never reviewed or signed … any SEC forms ….").

In another submission to the SEC, on or about August 2, 2023, AmeriStar submitted a Form D to the SEC through the EDGAR system. Voorhees Dec. ¶ 35. A Form D is used to file a notice of an exempt offering of securities with the SEC. *Id.* at ¶ 29. Filing a Form D does not indicate that a company or its securities are registered with the SEC. *Id.*

The Form D was purportedly e-signed by Mr. Britton, but Mr. Britton did not sign the Form D. Britton Dec. ¶ 7; Voorhees Dec. ¶ 35. The Form D also falsely listed Mr. Britton and Ms. Hoard as an executive and director of AmeriStar, respectively, but neither Mr. Britton nor Ms. Hoard are associated with AmeriStar. Britton Dec. ¶¶ 4-12; Hoard Aff. ¶ 8; Hoard Dec. ¶ 2; Voorhees Dec. ¶¶ 36-37.

## ARGUMENT

**I.      LEGAL STANDARD FOR THE SEC TO OBTAIN A TEMPORARY RESTRAINING ORDER AND ASSET FREEZE.**

Congress has provided statutory authorization for the SEC to seek, and courts to enter, "a permanent or temporary injunction or restraining order" upon a "proper showing" that the defendant "is engaged or is about to engage" in violations of the securities laws. Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]. In *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570 (2024), the Supreme Court recently applied the traditional four-part test for preliminary injunctions to emergency actions by a government agency and in *SEC v. Chappell,* 107 F.4th 114, 126-129 (3d Cir. 2024), the Third Circuit applied *Starbucks* to preliminary injunctive relief in an SEC enforcement action. Although some courts in the Tenth Circuit previously applied a different standard in SEC enforcement actions,[3] *Starbucks* supplies the correct standard, and the SEC satisfies that standard here.

The four-part test applied in *Starbucks* requires the SEC to show (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Starbucks*, 144 S. Ct. at 1576; *see also Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (describing the traditional four-factor test).

---

[3] *See, e.g.*, *SEC v. Cell>Point, LLC*, No. 21-cv-1574-PAB-KLM, 2022 WL 444397, at *5 (D. Colo., Feb. 12, 2022) ("Courts have not required the SEC to show irreparable injury, but rather require the SEC to show that defendant's actions violate the defendant's statutory obligations.") (collecting and citing cases). *But see SEC v. Digital Licensing Inc.*, No. 23-cv-482-RJS-DBP, 2023 WL 8283613, at *7 (D. Utah, Nov. 23, 2023) (applying traditional four-part test in SEC enforcement action).

Some preliminary injunctions require a heightened standard: preliminary injunctions that (1) alter the status quo; (2) mandate (rather than prohibit) action; or (3) grants all the relief that the moving party could expect from a trial win. *Mrs. Fields Franchising*, 941 F.3d at 1232. For these "disfavored" preliminary injunctions, the movant must "make a strong showing" that the likelihood-of-success-on-the-merits and the balance-of-harm factors tilt in the movant's favor. *Id.* (quotation omitted).

A. **Irreparable injury: There is a high risk that future and current investors will lose their money without a restraining order and asset freeze.**

A showing of likely irreparable harm is the most important factor for the issuance of preliminary injunction, and the moving party must first show that this injury is likely before the other requirements for a preliminary injunction are considered. *New Mexico Dep't of Game & Fish v. United States Dep't of the Interior*, 854 F.3d 1236, 1249 (10th Cir. 2017) (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004). To obtain a temporary restraining order or preliminary injunction, the SEC must establish that it "is likely to suffer irreparable harm in the absence of preliminary relief." *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). A "certain and great" injury likely to occur before the district court rules on the merits satisfies this factor. *Id.* Because the SEC is seeking to recover funds to compensate AmeriStar's investors, the dissipation or loss of investor money is a harm to the SEC for purposes of the irreparable harm factor. *See, e.g.*, *SEC v. Reven Holdings, Inc.*, No. 22-cv-03181-DDD-KLM, 2024 WL 3714389, at *9 n.12 (D. Colo., July 26, 2024) (dissipation of assets causes harm to "existing investors and the availability to pay any disgorgement or other future judgment.").

If AmeriStar is permitted to keep soliciting investments, luring potential investors to invest money under false promises, investors will continue to invest in AmeriStar while relying

on AmeriStar's fraudulent statements and conduct, and AmeriStar will misuse their money. As shown in Declarations submitted by investors, AmeriStar is using advertisements on Facebook to take money from unaccredited investors and from the retirement savings of workers. *See* Hermansen Dec. ¶¶ 1-3, 6; Wood Dec. ¶¶ 2-3, 7. In fact, even when a potential investor told AmeriStar that he was not accredited, AmeriStar took his money anyway and said it "would make an exception" because the investor was "close enough." Nelson Dec. ¶ 6. And based on AmeriStar's refusal to respond to inquiries of current investors, it is unlikely that AmeriStar will ever repay funds solicited from future investors. Wood Dec. ¶¶ 10-11; Hermansen Dec. ¶¶ 11-13; Nelson Dec. ¶¶ 11-12.

Without orders prohibiting AmeriStar from continuing to solicit, accept, or deposit additional funds from investors and requiring that websites that advertise AmeriStar's investments be taken down and/or remain down, AmeriStar will continue to harm new investors and statutory violations like those described below are likely to recur, which could irreparably harm prospective investors. AmeriStar's social media accounts are still advertising AmeriStar's securities and encouraging the public to contact AmeriStar (though the most recent posts were from April 2024), and it is likely that anyone who invests will lose their investment because AmeriStar has shown a pattern of misusing and dissipating investor funds.

As to current investors who have already handed over their money, economic harm without an adequate remedy to compensate that injury constitutes irreparable harm. *See, e.g.*, *Cloud Peak Energy Inc. v. United States Department of Interior*, 415 F. Supp. 3d 1034, 1042-43 (D. Wyo. 2019) ("[T]his Court has little difficulty concluding that the general rule that [e]conomic harm is not normally considered irreparable does not apply where there is no adequate remedy to recover those damages, such as in APA cases."); *see also DTC Energy*

*Group, Inc. v. Hirschfeld,* 912 F.3d 1263, 1270 (10th Cir. 2018) ("[T]he movant must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages.") (quotation omitted). "[I]njury may be irreparable if defendants will be financially unable to pay damages." *Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986) (quotation omitted); *see also Chappell*, 107 F.4th at 138 (Court found that there would be irreparable harm without an injunction because "[t]here [was] good cause to believe that, unless funds and assets are frozen ... [Chappell] will dissipate, conceal, or transfer from the jurisdiction of this Court assets that could be subject to an order directing disgorgement or the payment of civil money penalties in this action.").

The Court has broad equitable powers to prevent violators of the securities laws from enjoying the fruits of their misconduct, including freezing assets. *United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965); *see also SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103-04 (2d Cir. 1972). Courts regularly freeze assets in SEC enforcement actions to ensure that defendants do not dissipate assets pending final judgment and to ensure that victims of the securities fraud are compensated. *Manor Nursing Centers*, 458 F.2d at 1105-06; *SEC v. End of Rainbow Partners, LLC*, No. 17-cv-02670-MSK, 2017 WL 5404199, at *2 (D. Colo. Nov. 14, 2017) (stating the "purpose in seeking an asset freeze is to advance the public interest in ensuring that ill-gotten funds can be secured to satisfy a potential future judgment"). "A freeze is particularly warranted where"—as here—"the defendant's alleged conduct involves fraud." *SEC v. Credit Bancorp Ltd.*, No. 99-cv-11395, 2010 WL 768944, at *3 (S.D.N.Y. Mar. 8, 2010).

As described above, AmeriStar engaged in a pattern of dissipating investor funds. That pattern accelerated when AmeriStar learned about the SEC's investigation. For example, on April 11, 2024, the SEC issued subpoenas to AmeriStar (Voorhees Dec. ¶ 10), Freitag (*id.* ¶ 12), AmeriStar MK (*id.* ¶ 14), and Highline Gold (*id.* ¶ 19). That same day, an individual falsely claiming to be Mr. Britton ordered 41 ounces of gold coins worth over $101,000 and paid for those gold coins with investor money on April 16, 2024. *Id.* at ¶ 59(b). Similarly, on May 10, 2024, two days after Freitag testified in the SEC's investigation on May 8, 2024, over $996,000 of investor funds was sent from Freitag's IOLTA account to purchase 415 ounces of gold coins ordered by an individual falsely claiming to be Mr. Britton. *Id.* at ¶ 59(d). Given this pattern of dissipation, it is unlikely the SEC will be able to collect funds to compensate AmeriStar's investor victims without an asset freeze.

As another indication that investors will be harmed in the absence of injunctive relief, AmeriStar has recently stopped responding to investors' efforts to communicate about their investments and requests to get their money back. Wood Dec. ¶¶ 10-11; Hermansen Dec. ¶¶ 11-13; Nelson Dec. ¶¶ 11-12. While AmeriStar appears to have dissipated most investor money—the only significant amount of investor funds of which the SEC is aware is $130,000 currently in a Citizens Bank account,[4] Voorhees Dec. ¶ 78—an order freezing AmeriStar's assets and the assets of Relief Defendants is necessary to protect those funds and any other assets that the SEC is able to locate.

---

[4] These funds are at risk absent an asset freeze order because Citizens Bank has advised the SEC staff that it may be compelled to release the funds. Voorhees Dec. ¶ 57(c)(i).

**B.** <u>**Success on the merits**</u>**: The SEC will succeed on the merits of its fraud claims against AmeriStar and its claims for disgorgement against Relief Defendants.**

AmeriStar has harmed and is continuing to harm investors by fraudulently promising to use their money to purchase CDs in a purported "courtesy deposit" program, which they claim is safe. The antifraud provisions of the securities laws are designed to protect investors from these types of fraudulent practices. *SEC. v. Smart*, 678 F.3d 850, 857 (10th Cir. 2012) ("Fundamentally, both § 17(a) and § 10(b) are designed to protect investors from fraudulent practices.") (internal quotation marks omitted).

The SEC asserts two types of fraud claims under these anti-fraud provisions. *First*, the SEC alleges AmeriStar made false and misleading statements and omissions that violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder and Section 17(a)(2) of the Securities Act. *Second*, the SEC alleges AmeriStar's fraudulent conduct violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) and Securities Act Section 17(a)(1) and (3).

As to Relief Defendants, this Court has "broad equitable powers to order disgorgement from third parties who have received the proceeds of another's violation of securities laws if the party in possession of the proceeds has no legitimate claim to it." *SEC v. Erwin*, 553 F. Supp. 3d 895, 902 (D. Colo. 2021) (quotation omitted). Disgorgement from relief defendants is a form of equitable relief that prevents defendants, like AmeriStar, from "circumventing courts' ability to recapture fraud proceeds by the simple procedure of giving those proceeds to friends and relatives." *Id.* (quotation omitted). To establish a claim for disgorgement against a relief defendant, the SEC must show only that the relief defendant: (1) received ill-gotten funds; and (2) does not have a legitimate claim to those funds. *Id.*; *see also SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998).

1.    **AmeriStar made materially false and misleading statements and omissions violating Section 10(b) and Rule 10b-5(b) of the Exchange Act and Section 17(a)(2) of the Securities Act.**

To prove its claims for misstatements under Section 10(b) and Rule 10b-5(b) thereunder, the SEC must show that AmeriStar, directly or indirectly: (1) made an untrue statement of material fact or omitted to state a material fact; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) using any means of interstate commerce or of the mails. *See* 17 C.F.R. § 240.10b-5(b); *Smart*, 678 F.3d at 856-57 (10th Cir. 2012). Similarly, to prove liability under Securities Act Section 17(a)(2), the SEC must prove that AmeriStar, directly or indirectly: (1) obtained money or property by means of an untrue statement of material fact or an omission to state a material fact; (2) with negligence; (3) in the offer or sale of securities; (4) using any means of interstate commerce or of the mails. 15 U.S.C. § 77q(a)(2); *Smart*, 678 F.3d at 857; *SEC v. C. Jones & Co.*, 312 F. Supp. 2d 1375, 1379 (D. Colo. 2004) ("Under Section 17(a)(2)[], the elements are identical [to a Section 10(b) claim] except the SEC need show only negligence instead of scienter."). "The SEC is not required to prove reliance or injury [damages] in enforcement actions." *Geman v. SEC.*, 334 F.3d 1183, 1191 (10th Cir. 2003).

a.    **AmeriStar made materially false and misleading statements and omissions and obtained "money or property."**

AmeriStar made false and misleading statements. As noted above, in the Offering Materials, AmeriStar claimed it was using investor funds to purchase FDIC-insured CDs and that each account was fully insured. Voorhees Dec. ¶¶ 63-77. These statements were false and misleading because AmeriStar did not purchase CDs as promised. Bank records obtained by the SEC reflect substantial payments of investor funds to Relief Defendants, and those records did not reflect that any investor funds were used to purchase CDs. Voorhees Dec. ¶¶ 57-61. In fact, according to those records, over 50% of investor funds were used to purchase precious metals.

Voorhees Dec. ¶ 59. Freitag controlled the bank accounts in which investor funds were placed and those accounts often held assets over $250,000, meaning the funds above that amount were not FDIC-insured. Each of the statements was attributed to AmeriStar. Accordingly, AmeriStar is the maker of the statements. *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

The statements were material. Information is material when there is a substantial likelihood that a reasonable investor would consider it important in determining whether to buy or sell securities. *See Basic v. Levinson*, 485 U.S. 224, 231-32 (1988); *City of Phila. v. Fleming Companies, Inc.*, 264 F.3d 1245, 1265 (10th Cir. 2001) (same). To be considered material, a false statement or omission "need not be important enough that it would necessarily cause a reasonable investor to change his investment decision." *SEC v. Meltzer,* 440 F. Supp. 2d 179, 190 (E.D.N.Y. 2006).

Investors would have considered it material that, rather than investing their money in FDIC-insured CDs, as promised, AmeriStar instead directed Freitag to make purchases from companies that sold precious metals. Each statement addresses matters that go directly to the profitability of investors' investments. *See Smart*, 678 F.3d at 857 (the fact that defendants were not using money as represented would be material to a reasonable investor). This commonsense conclusion is reinforced by the testimony of defrauded investors, who have declared that the "courtesy deposit" program and FDIC insurance were attractive elements of the investment opportunity. Wood Dec. ¶ 5, Hermansen Dec. ¶ 3; Nelson Dec. ¶ 5.

AmeriStar obtained "money or property." As a result of its materially false and misleading statements, AmeriStar obtained at least $3.6 million from investors. Voorhees Dec. ¶ 31.

**b.     AmeriStar acted with scienter and negligently**.

Courts have defined scienter as a state of mind embracing intent to deceive, manipulate or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). Scienter can be met by a showing of knowledge or recklessness. *Smart*, 678 F.3d at 856-57. The Tenth Circuit has defined recklessness under the securities laws as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *City of Phila.*, 264 F.3d at 1260 (internal quotation marks omitted). "A defendant acts negligently in stating or omitting a material fact if he fail[s] to use the degree of care and skill that a reasonable person of ordinary prudence and intelligence would be expected to exercise in the situation." *SEC v. Mine Shaft Brewing LLC*, No. 21-cv-457-DBB-JCB, 2023 WL 6541552, at *10 (D. Utah, 2023) (quotation omitted).

AmeriStar acted through Unknown Actors who knew or were reckless in not knowing that the above statements were untrue. Voorhees Dec. ¶¶ 21-22. As controllers of the company with knowledge of its operations, their fraudulent intent is shown by the evidence above that they engaged in a continuous pattern of misusing and making false and misleading statements about how they planned to use investor funds. They acted knowingly or recklessly while making the misrepresentations and omissions. *SEC v. George*, 426 F.3d 786, 795 (6th Cir. 2005) (finding where defendant "spent investor funds on personal expenses, [is] a fact that itself establishes the requisite state of mind for committing securities fraud"); *see also Smart,* 678 F.3d at 857 (finding defendant acted with scienter where, among other things, defendant used investor funds to pay his wife's personal expenses). This evidence of fraudulent intent is bolstered by AmeriStar's recent refusal to communicate with investors who are attempting to assert their rights to their

investments and seek repayment. Wood Dec. ¶¶ 10-11; Hermansen Dec. ¶¶ 11-13; Nelson Dec. ¶¶ 11-12; Voorhees Dec. ¶¶ 92-94.

Fraudulent intent is also shown by evidence that the Unknown Actors continued to cause AmeriStar to make false and misleading statements about having FDIC insurance for its investment after AmeriStar received notice from the FDIC that its statements were false and misleading. AmeriStar received a letter from the FDIC on or about March 18, 2024, that confronted AmeriStar with its false and misleading statements, but nearly four months later, as of July 18, 2024, AmeriStar's Website stated that its investments were FDIC insured and that AmeriStar only works with banks that are FDIC insured. Voorhees Dec. ¶¶ 73-75.

The Unknown Actors operating AmeriStar also acted knowingly or with a reckless disregard for the truth when they engaged in a scheme to misuse investor funds. *See, e.g.*, *Centra, Inc. v. Chandler Ins. Co., Ltd.*, 2000 WL 1277672, at *14 (10th Cir. Sept. 7, 2000) ("[T]he fact that Defendants misappropriated and personally benefitted from Plaintiffs' investment . . . sufficiently established that they had the requisite intent to deceive, manipulate, or defraud.") (internal quotation marks omitted). Fraudulent intent is also demonstrated by the Unknown Actors' pattern of deceptive conduct designed to give investors a false sense of comfort with the reliability of AmeriStar's "courtesy deposit" program, including making false statements about its relationships with banks, making false statements about its registration status with the SEC, and identifying individuals, other than the Unknown Actors, with no connection to AmeriStar as the executives and leaders of AmeriStar.

In short, the Unknown Actors of AmeriStar told investors that their money would be placed in secure CDs but instead pooled investor money and used much of it to purchase precious metals that are difficult to trace. They also ignored investors' inquiries about the status

of their funds. As in *Smart*, "[t]hese circumstances go beyond mere recklessness and indicate a deliberate intent to defraud investors." 678 F.3d at 857 ("Smart told investors that their money would be placed in secure investment vehicles like mutual funds, but he then pooled the money into one account and used it to engage in risky financial ventures, make partial payments to other investors, and cover his and his wife's personal expenses. Smart also ignored investors' inquiries about the status of their funds and provided false accountings. These circumstances go beyond mere recklessness and indicate a deliberate intent to defraud investors.").

The fraudulent intent of the Unknown Actors that operate and control AmeriStar is imputed to AmeriStar. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003).

For these same reasons, AmeriStar also acted negligently since its conduct did not comport with the standard of care of a reasonable person. *See, e.g.*, *SEC v. Reven Holdings, Inc.*, 2024 WL 1675677, at *6 (D. Colo., Mar. 29, 2024) (Defendants "at the very least should have known that this misrepresentation regarding the use of investor funds was material. But even if the Commission is not successful in proving that they were made recklessly, the Commission is clearly likely to show that the misrepresentations were at a minimum made negligently.").

### c. AmeriStar's misconduct satisfies the "in connection with" and "in the offer or sale" requirements.

AmeriStar's misconduct was in connection with and in the offer or sale of securities. The SEC must show that AmeriStar's misconduct was "in connection with" (for Section 10(b) violations) or "in the offer or sale" (for Section 17(a) violations) of securities.

The notes offered and sold by AmeriStar are securities. Congress's purpose in creating the Securities Exchange Act "was to regulate investments, in whatever form they are made and by whatever name they are called." Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Exchange Act, 15. U.S.C. § 78c(a)(10), define "security" as including

"any note, stock" and "investment contract[.]" A note is presumed to be a security. *Reves v. Ernst & Young*, 494 U.S. 56, 67 (1990); *SEC v. Thompson*, 732 F.3d 1151, 1159 (10th Cir. 2013) (quoting *Reves*, 494 U.S. at 67).

The presumption that a note is a security can be rebutted only where the note bears a strong "family resemblance" to certain judicially created categories of notes that are plainly not securities (such as consumer financing notes, mortgage notes, and short-term commercial papers). *Thompson*, 732 F.3d at 1159. Courts consider four factors to consider in making this resemblance determination: (1) the motivations that would prompt a reasonable buyer and seller to enter into a transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether there is any risk-reducing factor, such as the presence of another regulatory scheme. *Id.* at 1160. These factors are to be considered as a whole. *See SEC v. Cell>Point, LLC*, No. 21-cv-01574, 2022 WL 2716549, at *6 (D. Colo. July 13, 2022) ("The factors are considered as a whole; a single factor is not dispositive.").

Applying the factors in *Reves*, the notes do not resemble any of the recognized categories of notes that are *not* securities. As to the motivations of the buyer and seller, AmeriStar claimed to raise funds from investors for its "courtesy deposit" program and investors were "interested primarily in the profit the note is expected to generate," including the return on the CD and the fee collected from the third-party borrower. As to the plan of distribution, the notes were offered and sold to a broad segment of the public, "and that is all [courts] have held is necessary to establish the requisite 'common trading' in an instrument." *Reves*, 494 U.S. at 68.

As to the reasonable perceptions of the investing public, AmeriStar marketed the notes to the general public through websites and social media and ultimately sold them to at least some non-accredited individual investors. Wood Dec. ¶ 2 (Facebook advertisement) and ¶ 7 (no steps

taken to verify accreditation status); Hermansen Dec. ¶ 2 (Facebook advertisement) and ¶ 6 ("I am not an accredited investor."); Nelson Dec. ¶ 2 (Facebook advertisement or internet search) and ¶ 6 ("I told the AmeriStar representative that I was not an accredited investor."). These investors unquestionably "have a legitimate need for protection by securities laws." *SEC v. Hartman Wright Group, LLC*, 19-cv-2418-PAB-KMT, 2020 WL 8186477, at *7 (D. Colo., Nov. 30, 2020) (quotation omitted). AmeriStar advertised the instruments as investments and there are "no countervailing factors that would have lead a reasonable person to question this characterization." *Reves*, 494 U.S. at 68-69.

Finally, as to risk-reducing factors, there is no ancillary regulatory scheme that controls or would oversee AmeriStar's notes. Although FDIC insurance promised by AmeriStar has been recognized as a risk-reducing factor, there is no evidence that AmeriStar purchased CDs and many investor funds in bank accounts were left unprotected by FDIC insurance.

Considering these factors together, the AmeriStar notes, which are presumed to be securities, do not resemble any of the judicially recognized categories of notes that are not securities. As a result, the presumption cannot be rebutted and the notes solicited by AmeriStar are securities under *Reves*.

AmeriStar used interstate commerce and the mails. "The 'in connection with' requirement is broadly interpreted to cover any fraud that 'coincide[s] with a securities transaction.'" *Smart*, 678 F.3d at 857 (quotation omitted). Indeed, "[the Tenth Circuit has] held 'misrepresentations made to induce a party to purchase a security *or to influence an investment decision* are made in connection with the purchase or sale of a security.'" *Id*. (quotation omitted) (emphasis in original). "The 'in connection with the purchase or sale of' and 'in the offer or sale

of' elements of Rule 10b–5 and § 17(a) can be interchangeable." *SEC v. Radius Capital Corp.*, 653 Fed. Appx. 744, 749 (11th Cir. 2016).

AmeriStar's misconduct here relates directly to the offer of securities: AmeriStar used the internet to disseminate false and misleading statements on its websites and social media accounts and investors wired money across state lines to purchase those securities. This use of the internet and wire transfers satisfies the interstate commerce element. *See, e.g.*, *SEC v. One or More Unknown Traders in Common Stock of Certain Issuers*, No. 08-CV-1402 (KAM)(JMA), 2009 WL 3233110, at *4 (E.D.N.Y. Oct. 2, 2009) (wire transfers, among other things, established interstate commerce); *SEC v. Milan Cap. Grp., Inc.*, 2000 WL 1682761, at *5 n.3 (S.D.N.Y. Nov. 9, 2000) (stating interstate wire transfers satisfy interstate commerce requirement; *One or More Unknown Traders*, 2009 WL 3233110 at *4 (wire transfers, among other things, established interstate commerce).

For all these reasons, the SEC has shown that AmeriStar violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder and Securities Act Section 17(a)(2).

> ## 2.    AmeriStar violated Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act and Section 17(a)(1) and (3) of the Securities Act.

AmeriStar's fraudulent conduct also violates Exchange Act Section 10(b) and Rules 10b-5(a) and (c) thereunder and Sections 17(a)(1) and (3) of the Securities Act because AmeriStar is engaging in deceptive conduct. Rules 10b-5(a) and (c) make it unlawful to "employ any device, scheme, or artifice to defraud" or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b-5(a) and (c). Securities Act Sections 17(a)(1) and (3) prohibit similar conduct in the offer or sale of securities. 15 U.S.C. §§ 77q(a)(1) and (3). The SEC must also establish that a defendant acted with scienter, except to show a violation of

17(a)(3), which requires only a showing of negligence. *See Aaron v. SEC*, 446 U.S. 680, 697 (1980); *Smart*, 678 F.3d at 857.

The language of these provisions is "expansive" and they "capture a wide range of conduct." *Lorenzo v. SEC*, 587 U.S. 71, 78-79 (2019). The Court held in *Lorenzo* that a defendant who knowingly disseminates a false statement to investors with the intent to deceive can violate Rules 10b-5(a) and (c) and Section 17(a)(1), even if the defendant is not a "maker" of the statement for the purpose of liability under Rule 10b-5(b). *Id.* at 83. The Court also noted that there is "considerable overlap among the subsections of" Rule 10b-5 and Section 17(a), and thus the same underlying conduct may establish a violation of more than one subsection. *Id.* at 80. Thus, a defendant who "makes" a misstatement can violate Rule 10b-5(a) and (c) and Sections 17(a)(1) and 17(a)(3), as well as Rule 10b-5(b) and Section 17(a)(2).

To prove fraud under Rule 10b-5(a) and (c) and Sections 17(a)(1) and (3), the SEC must prove that AmeriStar, directly or indirectly: (1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter or negligence for Section 17(a)(3). *SEC v. McDuffie*, No. 12-cv02939, 2014 WL 4548723, at *10 (D. Colo. Sept. 15, 2014).

AmeriStar is conducting an ongoing scheme to fraudulently raise money from investors and then divert their money. In connection with that scheme, AmeriStar engaged in multiple deceptive or manipulative acts in furtherance of its scheme.

First, AmeriStar made multiple false and misleading statements, which are deceptive and manipulative acts. *See, e.g., Lorenzo,* 587 U.S. at 76. On top of the false and misleading statements, AmeriStar misused investor funds. Rather than purchase CDs with investor money, AmeriStar diverted investor funds to make purchases from companies that sold precious metals.

*Voorhees Dec. ¶ 59.* This misuse of investor funds constitutes a "fraudulent scheme on the deceived investors." *SEC v. Cooper*, 142 F. Supp. 3d 302, 316 (D.N.J. 2015).

In addition, as described above, AmeriStar engaged in a course of deceptive conduct to enhance AmeriStar's credibility—false statements about relationships with other banks, the SEC, and its own executives and directors while obscuring the identity of the Unknown Actors who actually operate and control the company.

For the same reasons noted above, AmeriStar acted with scienter and used interstate commerce in connection with its scheme.

Based on the above, the SEC has made a showing that the AmeriStar violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) thereunder and Securities Act Sections 17(a)(1) and (3).

### 3.    Relief Defendants received ill-gotten gains and have no legitimate claim to those funds.

As noted above, to establish a claim for disgorgement against a relief defendant, the SEC must show that the relief defendant: (1) received ill-gotten funds; and (2) does not have a legitimate claim to those funds. *See Erwin*, 553 F. Supp. 3d 902.

As described above, the investor funds raised by AmeriStar and given to the Relief Defendants are ill-gotten proceeds of a fraud. While Freitag purports to have provided some services to AmeriStar and received some compensation for those services, he did not provide goods or services for the large majority of investor funds deposited into accounts that he controlled. AmeriStar MK and HighLine Gold received proceeds from AmeriStar's fraud for which they provided no reciprocal goods or services. The Relief Defendants therefore do not have a legitimate claim to those funds, and those funds should be returned to the investors the

AmeriStar defrauded. As a result, the SEC is likely to prevail on its claim against Relief Defendants for disgorgement.

* * * *

AmeriStar repeatedly and falsely told investors that it would use their money for safe investments while continually using investor funds for other purposes. AmeriStar obscured and lied about the individuals responsible for this misconduct and have refused to respond to investors' inquiries about their money. The showing of likelihood of success on the merits above satisfies the ordinary standard for preliminary injunctions. And, to the extent that an order prohibiting solicitation and deposit of additional investor funds and an order requiring that AmeriStar stop advertising on websites and social media could be considered a "disfavored injunction" the evidence above also satisfies the heightened standard for disfavored injunctions that requires a strong showing that this factor tilts in favor of injunctive relief.

### C.   The threatened injury to investors outweighs any potential injury to AmeriStar.

Investors have lost millions of dollars because of AmeriStar's false promises and deceptive conduct. As noted above, investors gave AmeriStar, through Freitag, AmeriStar MK, and another entity, substantial amounts of money because they were told that the investment was safe because it was FDIC-insured and would yield exceptional returns. Allowing this fraud to continue will cause significant harm to investors.

*First*, as explained above, if AmeriStar is permitted to keep soliciting investments, AmeriStar will harm additional members of the investing public, including unaccredited investors. It is unlikely that AmeriStar will ever repay funds solicited from future investors. This threatened injury to future investors far outweighs any potential injury to AmeriStar. The only "harm" a restraining order would cause AmeriStar is that it would prohibit AmeriStar form

32

stealing money from future investors. Even under the heightened standard for disfavored preliminary injunctions that requires a "strong showing," this factor tilts in favor of an order prohibiting AmeriStar from soliciting investments from prospective investors.

*Second*, without an asset freeze, AmeriStar will be able to dissipate or move any remaining investor money outside the jurisdiction of the Court, eliminating the ability of investors to receive any of their money back. Unless the Court grants the relief requested here, there is no reason to believe that AmeriStar will cease this conduct or otherwise return investors' money. Indeed, AmeriStar has already stopped returning investor phone calls and emails requesting assistance and has disconnected the phone number that investors used in the past to call AmeriStar. While an asset freeze will impose a cost on AmeriStar and the Relief Defendants, they are not using investor funds to buy FDIC-insured CDs as AmeriStar promised.

### D.    The requested relief is not adverse to the public interest.

"When a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight." *FTC v. Skybiz.com, Inc.*, No. 01-CV-396-K(E), 2001 WL 1673645, at *8 (N.D. Okla. Aug. 31, 2001), *aff'd sub nom*. *FTC v. Skybiz.com, Inc.*, 57 F. App'x 374 (10th Cir. 2003) (citing *FTC v. Affordable Media, Inc.,* 179 F.3d 1228, 1236 (9th Cir. 1999)). "[T]he public interest in preserving the illicit proceeds [of a defendant's fraud] for restitution to the victims is great." *Affordable Media, LLC*, 179 F.3d at 1236. Here, the relief requested by the SEC seeks to protect investors and potential investors and is therefore not adverse to the public interest.

AmeriStar has obtained millions of dollars from investors because of its repeated false and misleading statements and deceptive conduct. By restraining AmeriStar from soliciting, accepting, or depositing more investor funds, requiring AmeriStar and others to take down and/or keep down websites and Facebook and Instagram accounts associated with AmeriStar that

33

are soliciting investments, and freezing the assets and funds of AmeriStar and the Relief Defendants, the Court is preserving the public interest by both halting the potential for ongoing fraud, and preserving any remaining assets, thereby increasing the likelihood that investors defrauded by AmeriStar may be able to get at least some of their investment back. *See End of Rainbow Partners, LLC*, 2017 WL 5404199 at *2 (stating that "purpose in seeking an asset freeze is to advance the public interest in ensuring that ill-gotten funds can be secured to satisfy a potential future judgment.").

\* \* \* \*

For the reasons above, the SEC has satisfied the traditional four-factor standard for preliminary injunctive relief, including the heightened standard for preliminary injunctions that mandate action.

## II.     REQUESTED TEMPORARY RELIEF.

As demonstrated above, the SEC is entitled to emergency relief and lists the specific relief it requests.

### A.     The Court should enter appropriate injunctive orders.

The SEC seeks injunctive relief to maintain the status quo so that AmeriStar does not harm additional investors. To that end, the Court should prohibit AmeriStar from further soliciting, accepting, or depositing more funds from investors. This order is similar to other orders courts have issued to prevent future harm to investors. *See, e.g.*, *SEC v. Reliable One Res., Inc.*, No. 23-cv-00006, 2023 WL 177687, at *5 (E.D. Tex., Jan. 9, 2023) (temporarily restraining defendants from participating in the issuance, purchase, offer, or sale of any security with limited exception for training in personal accounts); *SEC v. Sethi Petroleum*, LLC, No. 15-cv-338, 2015 WL 11197824, at *2 (E.D. Tex., May 14, 2015) (prohibiting defendants from same).

Further, given the ongoing harm caused by AmeriStar's solicitation of the general public on the internet and its efforts to conceal the identity of the Unknown Actors that control AmeriStar, the Court should order that websites and social media pages that solicit AmeriStar's fraudulent investments be taken down and/or remain down. *See, e.g.*, *SEC v. GA Investors*, No. 23-cv-11050-JJ, Dkt. 35 (D. Mass. Nov. 2, 2023) (ordering defendants and web hosting companies to take down websites). Specifically, the Court should enter an order requiring that the following websites and social media pages that solicit AmeriStar's fraudulent investments be taken down, remain down, or both as applicable: AmeriStar Website hosted by Godaddy.com, *see, e.g.*, Voorhees Dec. ¶¶ 9, 40-47, 64-66, 82(b)-(c); the Banking Secure Website hosted by Goddady.com, *see, e.g.*, *id.* at ¶¶ 9, 48, 68; the AmeriStar Facebook page, *see, e.g.*, *id.* at ¶¶ 46, 52-53, 69; the AmeriStar Instagram page, *see, e.g.*, *id.* at ¶¶ 45, 70, 82(a); *see also* Wood Dec. ¶ 2 (Facebook advertisement); Hermansen Dec. ¶ 2 (Facebook advertisement) Nelson Dec. ¶ 2 (Facebook advertisement or internet search).

Finally, the Court should also temporarily restrain AmeriStar from violating Section 17(a) of the Securities, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, by engaging in the type of conduct described above. *See, e.g.*, *SEC v. Kokesh*, 834 F.3d 1158, 1162 (10th Cir. 2016); *SEC v. McLellan*, No. CV 16-10874-DPW, 2024 WL 3030421, at *5 (D. Mass. June 17, 2024); *SEC v. Collyard*, 861 F.3d 760, 764 (8th Cir. 2017); *SEC v. Graham*, 823 F.3d 1357, 1361 (11th Cir. 2016).

**B.    The Court should immediately freeze AmeriStar's and Relief Defendants' assets to prevent further dissipation of investor funds.**

As noted above, the "purpose in seeking an asset freeze is to advance the public interest in ensuring that ill-gotten funds can be secured to satisfy a potential future judgment." *End of*

*Rainbow*, 2017 WL 5404199 at *2. While courts in the Tenth Circuit have permitted a freeze sufficient to preserve not only disgorgement amounts but penalty amounts as well, *Reven Holdings*, 2024 WL 1675677 at *13 ("[A]n asset freeze is usually appropriate to facilitate enforcement of any remedy that might be ordered in the event a violation is established on summary judgment or at trial."), here the SEC seeks an order freezing AmeriStar's assets only up to the amount of disgorgement: the amount of its ill-gotten gains plus prejudgment interest. *See SEC v. Harkins*, No. 19-cv-2418, 2022 WL 3597453, at *14 (D. Colo., Aug. 23, 2022) ("[G]enerally, disgorgement includes prejudgment interest to ensure that wrongdoers do not profit from their illegal conduct, and calculating prejudgment interest based on the rate used by the IRS for underpayment of federal income tax.") (quotation omitted).

Thus, the SEC requests that, to maintain the status quo and prevent dissipation and diversion of its assets, the Court freeze AmeriStar's assets up to $3,773,245.46, wherever located, that are under their direct or indirect control. *See SEC v. Estates of Swensen*, No. 22-cv-00135, 2024 WL 327958, at *2 (D. Utah, Jan. 29, 2024) ("A freeze of assets is designed to preserve the status quo by preventing the dissipation and diversion of assets.") (quotation omitted). This amount is calculated by adding the amount of investor funds AmeriStar fraudulently raised, $3,698,536.37 (Voorhees Dec. ¶ 44), and prejudgment interest of $74,709.09, which is calculated with the interest rate used for underpayment of federal income tax and a period ending on August 30, 2024.

The Court's power to order an asset freeze is not limited to the alleged wrongdoer, here AmeriStar, and the SEC seeks an asset freeze against the Relief Defendants as well. Under the SEC's statutory authority to seek equitable relief, including injunctions and disgorgement, as well as the Court's inherent authority to fashion equitable relief, "the court may freeze the assets

of a party not accused of wrongdoing where that party: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *Estates of Swensen*, 2024 WL 327958 at *2; *see also Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011)). For the reasons above, and to prevent AmeriStar from circumventing the Court's ability to recapture fraud proceeds by giving them to affiliates like Relief Defendants here, *see Erwin*, 553 F. Supp. 3d at 902, the Court should freeze the assets of Relief Defendants up to the net amount of funds they received from AmeriStar that were not transferred to another relief defendant:

- AmeriStar MK: $1,231,000.41 (which is $1,198,868.98 of ill-gotten gains received, Voorhees Dec. ¶ 57(a), plus prejudgment interest of $32,131.43);

- Freitag: $448,841.14 (which is $439,954.22 of ill-gotten gains received, Voorhees Dec. ¶ 57(b), plus prejudgment interest of $8,886.62); and

- HighLine Gold: $2,074,557.95 (which is $2,047,171.38 of ill-gotten gains received, Voorhees Dec. ¶ 59, plus prejudgment interest of $27,386.57).

## III.     ANCILLARY RELIEF TO AID THE TEMPORARY INJUNCTIVE RELIEF

### A.     The Court should order a sworn accounting from AmeriStar and Relief Defendants to locate assets and determine the amount each obtained from the fraud.

To accurately locate and secure investor funds and assets subject to the asset freeze, and to determine the scope of the fraud and each defendant's and relief defendant's ability to disgorge illicit proceeds, courts often require defendants and relief defendants to provide a verified accounting of all monies or property obtained because of the fraudulent activity, as well as their current financial resources and assets. *See, e.g.*, *SEC v. Universal Consulting Res. LLC*, No. 10-CV-02794-JLK-KLM, 2010 WL 4873733, at *4 (D. Colo. Nov. 23, 2010) (granting SEC's *ex parte* motion for TRO and ordering an accounting by defendants and relief defendants); *see also SEC v. Int'l Swiss Inv. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990); *SEC v.*

*Spongetech Delivery Sys., Inc.*, No. 10-CV-2031 (DLI)(JMA), 2011 WL 887940, at *5 (E.D.N.Y. Mar. 14, 2011) (noting that ordering an accounting is "minimally intrusive"). Consistent with this precedent, the SEC also requests that the Court order AmeriStar and Relief Defendants to prepare sworn accountings. Such an order will allow the SEC to determine whether there are additional assets subject to the freeze.

**B.      The Court should order expedited discovery and alternative means of service to prepare for a preliminary injunction hearing.**

The Court should order expedited discovery and permit alternative means of service to enable the parties to gather evidence before any preliminary injunction hearing. Prompt discovery is also necessary to gather evidence necessary to effectuate the requested temporary restraining orders and asset freeze, including the identity of the Unknown Actors, the location and description of assets subject to the asset freeze, especially as the identity of the Unknown Actors, who would otherwise be deposed, are not known. *See, e.g.*, *Universal Consulting*, 2010 WL 4873733 at *5-6; *SEC. v. Mantria Corp.*, No. 09-cv-02676-CMA-MJW, 2009 WL 4693893, at *6 (D. Colo. Dec. 2, 2009).

**C.      The Court should order AmeriStar and Relief Defendants to preserve evidence.**

Courts regularly use their broad equitable authority to order the preservation of evidence in SEC enforcement actions. *See SEC v. Shields*, No. 11-cv-02121-REB, 2011 WL 3799061, at *2 (D. Colo. Aug. 26, 2011); *Mantria*, 2009 WL 4693893 at *6. Such an order is especially appropriate here because the Unknown Actors have obscured and lied about their identities to evade responsibility, which creates a risk that evidence that could be used to hold them accountable will not be preserved absent a Court order.

**D.      Emergency temporary relief is warranted under Rule 65(b).**

The SEC seeks this temporary emergency basis under Rule 65(b). The SEC will provide AmeriStar and Relief Defendants notice of this motion promptly by email and phone call to known phone numbers on the date of this motion once it is filed, followed by personal service. Thus, while the SEC does not seek relief on an *ex parte* basis, the SEC requests that the Court grant a temporary restraining order in the form of its Proposed Temporary Restraining Order, Asset Freeze, and Order Granting Other Emergency Relief and Setting Hearing to Show Cause (submitted with this motion) on an emergency basis to prevent further irreparable harm as described above.

Finally, the SEC requests that the Court order AmeriStar and Relief Defendants to show cause, at a preliminary injunction hearing, before any temporary restraining order expires, why the asset freeze and other emergency relief in the accompanying proposed order should not be extended for the pendency of the litigation in the form a preliminary injunction under Rule 65(a). *Universal Consulting*, 2010 WL 4873733 at *7; *Mantria*, 2009 WL 4693893 at *1.

## <u>CONCLUSION</u>

For all these reasons, the SEC asks the Court to grant its motion, the emergency relief requested above, and any other relief it deems just and proper. A proposed order is submitted with this motion.

Dated September 4, 2024

Respectfully submitted,

ERIC J. HEIMANN
Acting United States Attorney

By:     /s/ C. Levi Martin
C. LEVI MARTIN
Assistant United States Attorney

JODANNA L. HASKINS
TERRY R. MILLER
United States Securities and Exchange Commission

*Attorneys for Plaintiff*